# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 4011 | **DATE** | April 5, 2002 |
| **CASE TITLE** | Republic Tobacco v. North Atlantic Trading Co., et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated above, Republic's motion for summary judgment on its own claims [134-1] is granted as to Counts II, III, and VIII of the Second Amended Complaint and denied as to Count V. Republic's motion for summary judgment on North Atlantic's Counterclaim [ ] is granted as to Counts I, II, III, IV, V, VI, VII, and X and denied as to Counts VIII and IX. North Atlantic's motion for summary judgment [ ] is granted as to Counts IV and VI of the Second Amended Complaint, denied as to Count VIII, and granted in part and denied in part as to Count V. Republic's motion to exclude North Atlantic's foreclosure and price surveys is denied as moot. With respect to Count VIII of North Atlantic's Counterclaim, we dismiss Count VIII sua sponte with leave to replead the claims in separate counts, stating their factual basis. North Atlantic is given leave to replead the claims alleged in Count VIII by April 15, 2002. Republic is given leave to file a more complete motion for summary judgment (or a Rule 12(b)(6) motion) regarding those claims and Count IX by April 29, 2002. A status conference is set for May 8, 2002 at 11:00 a.m.

(11) x [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| X | Notices mailed by judge's staff. | | | **APR 09 2002** | 159 |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | Cin | docketing deputy initials | |
| | Copy to | | | | |
| | | | | date mailed notice | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DOCKETED

APR 0 9 2002

REPUBLIC TOBACCO, L.P.,          )
                                 )
          Plaintiff,             )
                                 )
          v.                     )          No. 98 C 4011
                                 )
NORTH ATLANTIC TRADING COMPANY,  )
INC., et al.,                    )
                                 )
          Defendants.            )

<u>MEMORANDUM OPINION</u>

Before the court are the parties' cross-motions for summary judgment. For the following reasons, both motions are granted in part and denied in part.

<u>BACKGROUND</u>

Plaintiff Republic Tobacco, L.P. ("Republic") imports and sells tobacco, roll-your-own ("RYO") cigarette papers, and other tobacco-related products. Defendant North Atlantic Trading Company, Inc. ("NATC") is Republic's direct competitor. Defendants North Atlantic Operating Company, Inc. ("NAOC") and National Tobacco Company, L.P. ("National") are wholly-owned subsidiaries of NATC. NAOC imports RYO cigarette papers and other tobacco-related products sold under the "ZIG-ZAG" brand name. National distributes and sells ZIG-ZAG cigarette papers, Beech-Nut loose leaf chewing tobacco, and other tobacco-related products. We will refer to all

defendants collectively as "North Atlantic" where appropriate. The following relevant facts are taken from plaintiff's Second Amended Complaint and from defendants' Counterclaim.

## A.    Republic's Allegations

### Incentive Programs

Republic and North Atlantic sell their RYO cigarette paper to distributors and wholesalers, who resell the products to outlets such as convenience, drug, and variety stores and gas station/mini-marts. As part of its marketing strategy, Republic offers certain incentive programs to these customers for stocking, selling (and promoting, in the case of distributors) Republic's products. Customers joining these programs can receive rebates, free products, and free travel in exchange for stocking or promoting specified amounts of Republic's RYO cigarette paper brands and meeting certain sales goals.[1]  (Second Amended Complaint, Sample Incentive Program Agreements, Exs. A-D.)

### Display Boxes

North Atlantic and its predecessors sometimes sold their RYO cigarette papers in limited promotional runs, packaged in a plastic

---

[1] The Republic Value-Added Rebate Incentive Program ("VRIP") provides incentives to distributors for stocking, promoting, and selling Republic's products to their retail accounts.  (Second Amended Complaint, ¶ 12.)  The Republic Convenience Store Distribution Incentive Program ("CDIP") provides incentives to convenience stores for stocking and selling Republic's products. (Id. ¶ 13.)  The Republic Travel Plus Program, open to both distributors and convenience stores, offers "points" to be used toward trips, such as cruises. (Id. ¶ 14 & Exs. C, D.)

display box.[2]  Customers received the display box along with their
purchase of the products inside.  Some of Republic's customers
wanted to use the boxes to display and sell Republic's cigarette
papers, so Republic obtained unused boxes from third-party
distributors.  Then Republic re-labeled the boxes with its own
labels, restocked the boxes with its products, and made them
available to customers who requested them.

### Disparaging Remarks

Republic alleges that North Atlantic engaged in an unlawful
"pattern of anticompetitive conduct" by making disparaging remarks
to Republic's customers regarding Republic's incentive programs and
display boxes.  Republic claims that North Atlantic contacted
Republic's customers, both orally and in writing, and falsely told
these customers that Republic's incentive programs violated federal
and state antitrust and unfair competition laws.  Republic alleges
that "North Atlantic's statements were designed to interfere with
Republic's customer relationships by causing customers to be
concerned about the legality of the programs and to believe that
Republic would be unable to honor its obligations under the
programs."  (Second Amended Complaint, ¶ 16.)

Republic claims that North Atlantic made unlawful disparaging
remarks on several occasions.  It is undisputed that John Czerewko,
North Atlantic's director of sales for the Midwest, sent a letter

---

[2] Most of the display boxes are off-white; some are blue.

in late January 1998 (the "Czerewko Letter") to Clark Refining and Marketing Company ("Clark"), which sells Republic's products to customers of its gas station/convenience stores. The letter discussed the modifications to the display boxes and asserted that North Atlantic's patent and trademark had been violated, prompting its attorneys to "initiate[] legal action." (Republic App. I, Vol. I, Ex. 11.) Republic contends that these statements were false because North Atlantic held no patent or trademark rights in the boxes and had not initiated litigation against anyone in connection with the display boxes. Republic also asserts that the Czerewko Letter falsely hinted that Republic's incentive programs are illegal by referring to them as "[s]moke & [m]irrors" and warning Clark to "[b]e aware of the Robinson-Patman Act."[3]

Republic alleges that Clark forwarded the Czerewko Letter to Clark's supplier, Eby-Brown, which buys products directly from Republic, and that Eby-Brown discontinued its participation in Republic's incentive programs after receiving the letter. Republic also claims that Clark subsequently discontinued its participation in Republic's incentive programs as well.

It is undisputed that on August 13, 1998, North Atlantic sent a letter (the "August 13 Letter") to its customers, many of whom are also Republic's customers. The August 13 Letter stated that

_____

[3] The Robinson-Patman Act, 15 U.S.C. § 13(a)-(f), prohibits certain price discrimination by a seller among its customers.

North Atlantic filed a lawsuit against Republic in Kentucky, and described North Atlantic's allegations in that suit. The allegations addressed, among other things, Republic's incentive programs and modification of the display boxes. The August 13 Letter did not mention the instant action, which was filed in late June 1998.[4]

Republic contends that North Atlantic's alleged misstatements have caused Republic to lose sales and have discouraged Republic's customers from participating in its incentive programs. (Second Amended Complaint, ¶ 46.)

## B.   North Atlantic's Allegations

North Atlantic alleges that Republic has engaged in wrongful conduct in two principal ways. First, North Atlantic refers to Republic's re-labeling of the North Atlantic display boxes as "defacement." On some boxes, North Atlantic's Zig-Zag name can be seen underneath Republic's new label. North Atlantic also alleges that Republic has also placed a "conversion chart" on the vendor displays that instructs sales clerks how to "convert" a customer's request for a North Atlantic brand of RYO cigarette papers into a

---

[4] The Second Amended Complaint also alleges that Jay Martin, North Atlantic's representative, told representatives of five nationwide tobacco-product distributors (who were also Republic's customers) that Republic's programs were illegal. This statement purportedly occurred at a meeting in Chicago in late July 1998. Republic now acknowledges that these allegations were made upon information and belief and based on hearsay statements, and concedes that there is no evidence that Martin described Republic's programs as being "illegal." (Republic Response at 3 n.3.) Because Republic cannot demonstrate a genuine issue of fact as to this allegation, we will not consider it as a basis for any of its claims.

Republic brand. According to North Atlantic, the re-labeling confuses consumers into buying Republic's brands thinking that they are affiliated with North Atlantic.

Second, North Atlantic alleges that Republic has engaged in anticompetitive practices regarding the sales of RYO cigarette papers to consumers in the southeastern United States (which North Atlantic defines as consisting of nine states--Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee, and Virginia).[5] Republic has claimed that its market share in the region is as much as 95 to 98 percent. North Atlantic attributes this dominant market share to "cash payments to distributors and retailers who are Republic's customers" and "rebate and incentive programs that reward various merchandise and extravagant trips and cruise vacations" based on the quantity of products a distributor or retailer purchases from Republic. (Counterclaim, ¶ 3.) According to North Atlantic, distributors and wholesalers are the "gatekeepers" to specific regions because RYO cigarette paper importers rely on them to market their products, as a majority of retailers buy from distributors. North Atlantic contends that distributors and wholesalers make buying decisions at a regional level.

---

[5] North Atlantic originally alleged that the "Southeast" consisted of ten states--Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia. (Counterclaim, ¶ 3.)

In recent years, Republic has revised its rebate and incentive programs to require exclusivity from distributors and retailers in the Southeast in order to qualify for certain program benefits. When a distributor or retailer decided to carry Republic's RYO cigarette papers exclusively, Republic bought the entire quantity of North Atlantic's products carried by that distributor or retailer and resold them outside of the Southeast. North Atlantic claims that Republic has "selectively enforced" the exclusivity requirements by informing some incentive program participants that they would lose "points" in Republic's program if they carried North Atlantic's products, when other similarly situated customers had not incurred such a penalty. North Atlantic also claims that Republic representatives contacted the parties' mutual customers in an attempt to undermine their relationship with North Atlantic, offering the distributors and their employees and family members cash incentives, vacations, personal gifts, and other items.

North Atlantic asserts that Republic's conduct has harmed competition in the Southeast market by: (1) materially excluding North Atlantic and other competitors from the region; (2) effectively eliminating consumer choice in the region; and (3) raising the price of RYO cigarette papers above the competitive level in areas where Republic's exclusivity agreements have prevented its competitors from entering the market. North Atlantic

contends that there is no legitimate business justification for Republic's exclusivity programs.

## C. **The Pending Actions**

On June 30, 1998, Republic filed a four-count complaint in the instant case against NATC and NAOC. On July 15, 1998, NAOC and National filed an action against Republic and its affiliated companies in the United States District Court for the Western District of Kentucky, primarily alleging antitrust violations. The two pending actions have some overlapping facts; all discovery matters were heard in this court.

In the instant case, after the defendants moved to dismiss several counts of the complaint, we gave Republic leave to amend. Republic filed an amended complaint on September 16, 1998, which added National as a defendant. North Atlantic moved to dismiss several counts of the amended complaint, and, in a memorandum opinion dated April 8, 1999, we dismissed Counts I (declaratory relief regarding patent infringement), VII (violation of the Illinois Consumer Fraud and Deceptive Business Practices Act), IX (unfair competition), and X (unlawful monopolization and attempted monopolization in violation of the Sherman Act). Republic then filed a second amended complaint, which added Counts XI and XII for monopolization and attempted monopolization in violation of federal and state laws. We dismissed those two counts in a memorandum opinion dated December 23, 1999.

Thus, we currently have before us the following six counts of Republic's Second Amended Complaint: declaratory relief regarding trademark infringement (Count II) and Republic's incentive programs (Count III); tortious interference with customer relationships (Count IV); false advertising in violation of the Lanham Act (Count V); violation of the Uniform Deceptive Trade Practices Act (Count VI); and defamation (Count VIII).

North Atlantic moves for summary judgment on Counts IV, V, VI, and VIII. Republic cross-moves for summary judgment on Counts V and VIII and also moves for summary judgment on Counts II and III.

North Atlantic filed a ten-count amended counterclaim on April 30, 1999. The counterclaim alleges unfair competition, false advertising, and trade dress infringement in violation of the Lanham Act (Counts I-III); antitrust violations under the Sherman Act (Counts IV, V) and the Clayton Act (Count VI); restraint of trade, monopolization and attempted monopolization in violation of state law (Count VII); unfair competition, violation of the Uniform Deceptive Trade Practices Act, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, trade dress infringement, and palming-off (Count VIII); tortious interference with business relations and economic advantage (Count IX); and conversion of property and trespass to chattels (Count X). Republic moves for summary judgment on all of North Atlantic's counterclaims.

## DISCUSSION

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Management Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

## A.   Plaintiff's Claims

### 1.   Count II -- Declaratory Relief/Trademark Claims

Republic contends that it is entitled to summary judgment on Count II, which seeks a declaratory judgment that Republic has not infringed any North Atlantic trademark in connection with the

display box modifications and use. Republic argues that there is
no evidence that North Atlantic has a protectible interest in its
vendor displays or of actual or likely confusion.

North Atlantic first argues that "[t]here is ample evidence
that Republic has infringed North Atlantic's registered ZIG-ZAG
trademark by partially concealing ZIG-ZAG banner trademarks with
Republic's JOB trademarks." (North Atlantic Response at 45.)
There are two problems with this argument. First, North Atlantic
fails to cite to any supporting evidence in the record. Conclusory
arguments unsupported by the record are insufficient to preclude
summary judgment, and we are not obliged to "scour the record"
looking for factual disputes.[6] Waldridge v. American Hoechst
Corp., 24 F.3d 918, 921-22 (7th Cir. 1994); Taylor v. Monsanto Co.,
150 F.3d 806, 809 (7th Cir. 1998). Second, Republic points out
that North Atlantic's argument is inconsistent with the position
taken in North Atlantic's discovery responses. North Atlantic
declined to provide discovery regarding its ZIG-ZAG and "Boris"
trademarks, stating that such discovery was not relevant because
"North Atlantic is not claiming infringement of those marks."

---

[6] Because we instructed the parties that it was not necessary to file
Local Rule 56.1 statements of material fact, it was even more incumbent upon the
parties to cite to specific evidence in the record to support the arguments in
their briefs. Rather than providing us with clear arguments and clear citations
to supporting law and evidence, both parties have muddied the waters in several
instances as to what is at issue in these motions--e.g., whether they agree on
applicable law, whether certain facts are undisputed, whether those facts are
material, etc. To put it another way, the briefs are simply not "user-friendly."
North Atlantic's briefs, especially, fail to cite to supporting evidence for many
of the arguments contained therein.

North Atlantic also stated that it was "not claiming infringement of any particular registered trademark. Rather, North Atlantic claims that Republic has misappropriated North Atlantic's trade dress in the design of the vendor display boxes." (Republic Reply App., Ex. 1.)[7] Given its express renunciation of any trademark infringement claim and refusal to produce discovery on that ground, North Atlantic now is precluded from taking the position that Republic infringed its registered trademarks. Thus, the only issue is whether Republic infringed North Atlantic's trade dress in relation to the re-labeling of the plastic display boxes.

Trade dress means "the total image of a product" and includes size, shape, color(s), texture, graphics, and particular sales techniques. Syndicate Sales, Inc. v. Hampshire Paper Corp., 192 F.3d 633, 636 (7th Cir. 1999). To establish trade dress infringement, a plaintiff must demonstrate that "1) its trade dress is either inherently distinctive or has acquired secondary meaning, and 2) that the similarity of the defendant's trade dress causes a likelihood of confusion on the part of customers as to the source or affiliation of the products." Id. (citing Thomas & Betts Corp. v. Panduit Corp., 138 F.3d 277, 291 (7th Cir. 1998)).

"A plaintiff's trade dress is inherently distinctive, and therefore protectable without proof of secondary meaning,, if it is 'sufficiently distinctive to allow consumers to identify the

---

[2] Furthermore, North Atlantic did not bring a counterclaim for trademark infringement.

product from the trade dress.' In order to be inherently distinctive, the trade dress must be either arbitrary or suggestive, rather than generic or descriptive." Computer Care v. Service Sys. Enters., Inc., 982 F.2d 1063, 1069 (7th Cir. 1992) (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768-69 (1992)) (other citations omitted). "Secondary meaning is acquired when in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself. Secondary meaning can be established through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying." Thomas & Betts, 138 F.3d at 291 (citations and internal quotation marks omitted).

Republic contends that the display boxes are merely functional--they dispense RYO cigarette papers--and cannot be considered inherently distinctive. On the confusion issue, Republic argues that there is no factual basis on which to conclude that confusion exists or is even likely, pointing out that several North Atlantic representatives testified that they knew of no customer confusion relating to the modified display boxes.

Republic is correct; North Atlantic wholly fails to create a genuine issue of material fact with respect to Count II. North Atlantic makes only a halfhearted attempt to argue that the display

boxes are inherently distinctive or have acquired secondary meaning. It submits no evidence at all (such as photographs) about the physical characteristics of the boxes themselves. Regarding secondary meaning, North Atlantic cites to only two exhibits in the record but completely fails to explain how the exhibits demonstrate secondary meaning, which is not apparent to us. In addition, North Atlantic does not even develop an argument that there was actual or likely confusion associated with the display boxes' trade dress, let alone present any evidence on this issue. Consequently, summary judgment for Republic is granted on Count II of the Second Amended Complaint.

### 2.   Count III -- Declaratory Relief/Incentive Programs

Republic argues that it is entitled to summary judgment on Count III, which seeks a declaration that Republic's incentive programs do not violate federal or state antitrust laws.

For the reasons stated _infra_ regarding Counts IV, V, VI, and VII of North Atlantic's Counterclaim, Republic's motion for summary judgment on Count III is granted.

### 3.   Count IV -- Tortious Interference with Customer Relationships

Defendants move for summary judgment on Count IV. Republic alleges in Count IV that defendants tortiously interfered with its customer relationships. Republic claims that North Atlantic wrongfully induced Republic's customers to end or diminish certain business relationships with Republic, leading to lost sales. This

tort generally is recognized in Illinois as "tortious interference with prospective economic advantage." <u>See, e.g.</u>, <u>Dowd & Dowd, Ltd. v. Gleason</u>, 693 N.E.2d 358 (Ill. 1998).

The four elements of a claim for tortious interference with prospective economic advantage are as follows: (1) a reasonable expectation of a valid business relationship or economic advantage; (2) the defendant's knowledge of the expectancy; (3) purposeful interference by the defendant that defeats the expectancy; and (4) damages to the plaintiff resulting from the interference. <u>See</u> <u>Douglas Theater Corp. v. Chicago Title & Trust Co.</u>, 641 N.E.2d 584, 590 (Ill. App. Ct. 1994).

North Atlantic argues that it is entitled to summary judgment on Count IV because Republic has failed to prove (1) that it had a business expectancy that was defeated <u>because</u> of North Atlantic's conduct; or (2) damages. We agree.[8] Republic's claim is based largely on the Czerewko Letter. Republic contends that the letter caused Clark to cancel its exclusive arrangement with Republic and caused Eby-Brown to stop participating in one of Republic's incentive programs. Republic, however, offers no evidence in support of this allegation. There is no evidence that Clark decided to stop exclusively stocking Republic brands because of

---

[8] Because we find that Republic has failed to establish a genuine issue of material fact with respect to these elements of its claim, we need not address the issue of whether North Atlantic's actions were protected by the "competitor's privilege."

North Atlantic's actions.[9] As for Eby-Brown, its Vice President of Merchandising testified that Eby-Brown declined to continue participating in Republic's VRIP Program in 1998 because the program had changed and it was not in Eby-Brown's best interests to stock only Republic papers due to customers' demand for variety. (Deposition of Curtis O'Rourke at 11, 74-75.)

Republic further argues that its tortious interference claim is "not limited [to] its relationships with Clark and Eby Brown"[10] because the August 13 Letter was sent to a number of other customers. (Republic Response at 9.) Republic fails to identify any specific customers who terminated or altered their relationship with Republic as a result of the August 13 Letter, though. Thus, its claim fails. See Ecoco, Inc. v. Universal Beauty Prods., Inc., No. 98 C 676, 1998 WL 887072, at *3 (N.D. Ill. Dec. 11, 1998) (holding that plaintiff could not prove a tortious interference claim because it failed to identify any specific customer who terminated a business relationship with plaintiff because of defendant's actions).

---

[9] On this issue, Republic submits the affidavit of Warren Schoening, its National Sales Manager. Schoening states that "[b]ecause Clark had no other reason for canceling the [exclusivity] contract, I concluded that its cancellation was based on North Atlantic's conduct." (Republic App. II, Vol. I, Schoening Aff. ¶ 15). However, such conclusory and self-serving statements in an affidavit without support in the record cannot create a triable issue of fact. See Hall v. Bodine Elec. Co., 276 F.3d 345, 354 (7th Cir. 2002).

[10] Apparently, Republic has abandoned its contention that North Atlantic interfered with Republic's relationship with a company called Garber Brothers, Inc. (as alleged in the Second Amended Complaint).

Republic also fails to show damages resulting from North Atlantic's conduct. Republic presents sales data showing an overall decline in sales among all of its customers and an expert report claiming that the harm attributable to North Atlantic's conduct should be calculated based on 30% of Republic's total lost sales for 1998. (Republic App. I, Vol. I, Ex. 17.) Republic argues that this is all it is required to show. In support of its argument, Republic cites <u>Celex Group, Inc. v. Executive Gallery, Inc.</u>, 877 F. Supp. 1114, 1124 (N.D. Ill. 1995). <u>Celex</u>, however, does not support plaintiff's position. Nothing in that opinion indicates that Republic can prove damages simply by showing an overall decline in sales. Rather, it must show damages that are tied to the claimed interference with particular customers. <u>See</u> <u>Ecoco</u>, 1998 WL 887072, at *3 ("Universal merely points to sales data which shows a decline in Universal's sales. This information is wholly irrelevant when dealing with a tortious interference with prospective economic or business relationships.") Republic fails to do so, and thus has not met its burden with respect to the fourth element of its tortious interference claim. Thus, summary judgment for North Atlantic on Count IV is appropriate.

### 4. <u>Count V -- Lanham Act</u>

North Atlantic moves for summary judgment on Count V, which alleges that North Atlantic made false statements to Republic's customers regarding Republic's incentive programs and modification

of the display boxes, and thereby violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[11]

The Lanham Act creates a cause of action for false description or presentation, known as a "false advertising" claim. Section 43(a) of the Lanham Act provides in relevant part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which--
> . . .
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

To establish a claim under the false or deceptive advertising prong of § 43(a) of the Lanham Act, a plaintiff must prove: (1) a false statement of fact by the defendant in a commercial advertisement or promotion; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by

---

[11] Although Republic states that it moves for summary judgment on Count V, Republic presents no argument or supporting evidence for granting it summary judgment on this claim. Its motion is therefore denied as to Count V.

a loss of goodwill associated with its products. <u>See</u> <u>Hot Wax, Inc.</u> <u>v. Turtle Wax, Inc.</u>, 191 F.3d 813, 819 (7th Cir. 1999) (citing <u>B.</u> <u>Sanfield, Inc. v. Finlay Fine Jewelry Corp.</u>, 168 F.3d 967, 971 (7th Cir. 1999). "In addition, to recover money damages under the Act, a plaintiff must prove both actual damages and a causal link between defendant's violation and those damages." <u>Id.</u> at 819-20.

First, North Atlantic contends that "Republic cannot prove that any of the statements at issue are false" because the Czerewko Letter contained expressions of opinion and the August 13 Letter merely summarized its allegations against Republic in the Kentucky action. (North Atlantic Memorandum at 18.) For the reasons discussed <u>infra</u> regarding Republic's defamation claim, we reject this argument.

Next, North Atlantic asserts that communications with customers describing litigation between competitors, such as the August 13 Letter, are not actionable under the Lanham Act. None of the three cases North Atlantic cites in support of this argument stands for this broad proposition, though; each was decided on different, and narrower, grounds.[12] Moreover, North Atlantic's

---

[12] In <u>William H. Morris Co. v. Group W, Inc.</u>, 66 F.3d 255 (9th Cir. 1995), the counter-plaintiff sought damages. The court held that the counter-plaintiff failed to establish that the statement at issue actually deceived a significant number of consumers. This was "not necessarily fatal" to its case, though, because if the counter-defendant had intentionally misled consumers, then the court would presume deception. The case was remanded for a finding as to whether counter-defendant acted with the intent to deceive. In <u>H.W. Carter & Sons, Inc. v. William Carter Co.</u>, 913 F. Supp. 796, 805 (S.D.N.Y. 1996), the court held that the misleading aspects of the letter at issue were not material. In <u>Black & Decker (U.S.) Inc. v. Pro-Tech Power Inc.</u>, 26 F. Supp. 2d 834 (E.D. Va. 1998), the plaintiff's Lanham Act claim failed because the allegedly

argument does not apply to the Czerewko Letter, which did not describe litigation between competitors.

North Atlantic also argues that Republic cannot establish that it was actually damaged as a result of any of North Atlantic's statements, as required to recover damages under the Lanham Act. Republic's response is that its "expert and its sales and marketing team will testify that the losses experienced by Republic in 1998 were the result of [North Atlantic's] campaign of defamation." (Republic Response at 11.) This showing is insufficient to prevent "partial" summary judgment on Republic's claim for damages on this count.[13] To recover damages on its Lanham Act claim, Republic must prove actual damages and connect them to the letters. It cannot do so; therefore, we hold as a matter of law that Republic cannot

---

misleading letter did not contain any misrepresentations, as the claims described therein were meritorious.

[13] While judgment as a matter of law on a portion of a single claim is not an option under the Federal Rules, a district court may, pursuant to Rule 56(d), issue an order "specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy." Fed. R. Civ. P. 56(d); see also Occidental Fire & Cas. Co. v. Continental Bank N.A., 918 F.2d 1312, 1320 (7th Cir. 1990) (noting that under Rule 56(d) the trial court may enter a binding order "listing the facts that are not in dispute"); U.S. ex rel. Ramm Plumbing Co. v. Wil-Freds Constr., Inc., 1997 WL 391456, No. 96 C 793, at *4 (N.D. Ill. July 7, 1997) (Grady, J.). Although this pretrial procedure is sometimes labeled "partial summary judgment," it is actually interlocutory in nature. Capitol Records, Inc. v. Progress Record Distrib., Inc., 106 F.R.D. 25, 29 (N.D. Ill. 1985); see also EEOC v. Sears, Roebuck & Co., 839 F.2d 302, 353 n.53 (7th Cir. 1988) (noting that "the phrase 'partial summary judgment' is typically a misnomer used to describe a pretrial order under [Rule] 56(d)" because such an order "is definitely interlocutory and nonappealable"). The purpose of this procedure is twofold: to salvage some of the judicial effort involved in the denial of a motion for summary judgment and to streamline the litigation process by narrowing the triable issues. Lovejoy Elects., Inc. v. O'Berto, 616 F. Supp. 1464, 1473 (N.D. Ill. 1985) (citing, inter alia, Yale Transp. Corp. v. Yellow Truck & Coach Mfg., 3 F.R.D. 440, 441 (S.D.N.Y. 1944)).

recover damages on Count V. This order does not dispose of the entire Lanham Act claim because Republic seeks not only damages for the alleged Lanham Act violation, but also equitable relief in the form of an injunction and the recovery of any profits earned by North Atlantic as a result of its conduct. North Atlantic's motion does not address those remedies.

North Atlantic's motion for summary judgment on Count V is granted in part: as a matter of law, Republic cannot recover damages on its claim. The motion regarding Count V is denied in all other respects. As addressed <u>supra</u> footnote 11, Republic's motion for summary judgment on Count V is denied.

### 5. <u>Count VI -- Uniform Deceptive Trade Practices Act</u>

North Atlantic moves for summary judgment on Count VI, in which Republic alleges that North Atlantic violated the Illinois Uniform Deceptive Trade Practices Act (the "UDTPA"). The UDTPA states in pertinent part:

> A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person: . . . (8) disparages the goods, services, or business of another by false or misleading representation of fact; [or] . . . (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

815 ILCS 510/2. "The [UDTPA] does not provide a cause of action for damages, but it does permit private suits for injunctive relief and has generally been held to apply to situations where one competitor is harmed or may be harmed by the unfair trade practices of another." <u>Greenberg v. United Airlines</u>, 563 N.E.2d 1031, 1036-

37 (Ill. App. Ct. 1990) (citation omitted). Essentially, the statute codifies the common-law tort of commercial disparagement. See Crinkley v. Dow Jones & Co., 385 N.E.2d 714, 719 (Ill. App. Ct. 1978).

North Atlantic argues that the UDTPA "only covers statements that go to the quality of a party's goods or services and is not applicable to statements about whether a competitor has broken the law." (North Atlantic Memorandum at 20.) We agree. Illinois courts have construed the UDTPA to apply only to statements disparaging the quality of a business's products; statements that impute a want of integrity are not actionable under the UDTPA. See Allcare, Inc. v. Bork, 531 N.E.2d 1033, 1037 (Ill. App. Ct. 1988) ("Defamation lies when a person's integrity in his business or profession is attacked while commercial disparagement lies when the quality of his goods or services is attacked."); Crinkley, 385 N.E.2d at 719-20; Donnelley Mktg., Inc. v. Sullivan, No. 01 C 9273, 2002 WL 314631, at *3-4 (N.D. Ill. Feb. 28, 2002).[14] Even considered in the light most favorable to Republic, the statements contained in the Czerewko and August 13 Letters impugned Republic's business integrity, but not its products, and therefore do not

---

[14] We realize that this construction of the statute may disregard the word "business" in the phrase "disparages the goods, services, or business of another." However, we must follow the Illinois courts' interpretation of Illinois law.

support a UDTPA claim.[15]  Summary judgment for North Atlantic is granted as to Count VI of the Second Amended Complaint.

### 6.  Count VIII -- Defamation

Both parties move for summary judgment on Count VIII, which alleges that North Atlantic's false statements to Republic's customers damaged Republic's reputation, sales, and customer relationships.  Under Illinois law, the elements of a claim for defamation are (1) a false statement concerning plaintiff; (2) defendant's unprivileged publication of that statement to a third party; and (3) damage to the plaintiff.  See Krasinski v. United Parcel Serv., Inc., 530 N.E.2d 468, 471 (Ill. 1988).

North Atlantic contends that Republic cannot connect the allegedly defamatory statements to any special damages.  Republic argues that "[s]everal of [North Atlantic's] statements are so egregious that they qualify as defamation per se" for which a showing of special damages is not required.  (Republic Response at 3.)  Specifically, Republic argues that the Czerewko and August 13 Letters qualify as defamation per se.

Statements may be either defamatory per quod or defamatory per se.  If a statement is deemed defamatory per se, the plaintiff need not prove actual damage to his reputation; rather, such statements

---

[15]/ Because we are granting summary judgment on this ground, we need not address North Atlantic's alternative arguments that summary judgment is appropriate because (1) the letters said nothing false or misleading; and (2) the only relief available under the UDTPA is injunctive relief, and the conduct at issue has ceased with no threat of future harm.

are considered so obviously and materially harmful that injury may be presumed. See Kolegas v. Heftel Broad. Corp., 607 N.E.2d 201, 206 (Ill. 1992). In contrast, special damages must be proved with respect to statements that are allegedly defamatory per quod. See Dubinsky v. United Airlines Master Executive Council, 708 N.E.2d 441, 447 (Ill. App. Ct. 1999). Illinois law considers five types of statements to be defamation per se. They are statements that impute: (1) the commission of a crime; (2) infection with a communicable disease; (3) inability to perform or want of integrity in the discharge of duties of office or employment; (4) lack of ability, or prejudice a party, in his or her profession or trade; and (5) false accusations of fornication or adultery. See Bryson v. News Am. Publications, Inc., 672 N.E.2d 1207, 1214-15 (Ill. 1996).[16] Republic argues that the comments in the Czerewko and August 13 Letters fall into the first, third, and fourth categories.

### a. Czerewko Letter

The Czerewko Letter proposed a rebate to Clark for carrying Zig-Zag papers and discussed Republic's competing incentive program and exclusivity requirement. Czerewko said "there may be some Smoke & Mirrors" with Republic's programs and warned Clark to "[b]e

---

[16] Contrary to North Atlantic's suggestion, the standard of proof for defamation per se is no different for corporations than for individual plaintiffs. See Brown & Williamson Tobacco Corp. v. Jacobson, 713 F.2d 262, 269 (7th Cir. 1983). Obviously, though, the second and fifth categories of defamation per se could not apply to a corporation.

aware of the Robinson-Patman Act." (Republic App. I, Vol. I, Ex. 11.) The letter also stated:

> Recently, another Chain was positioned for exclusivity and a modified, defaced Zig Zag [display box] was used. We own the patent-trademark which has been violated. Our Attorneys initiated legal action regarding this and had to include the Chain [that had used the display box] in Trademark-Patent violation.

(Id.) Assuming that the statements in the Czerewko Letter are actionable--which we discuss infra--they fall into the third and fourth categories of defamation per se. The letter attacks the integrity of Republic's business conduct and prejudices Republic in its business.

Substantial truth is an absolute defense to a defamation claim. See Hollymatic Corp. v. Daniels Food Equip., Inc., 39 F. Supp. 2d 1115, 1118 (N.D. Ill. 1999). North Atlantic argues that the Czerewko Letter is not actionable because it does not contain any statements that can be proven false; rather, it merely expresses Czerewko's "concerns" and opinions. We agree with North Atlantic on this point, but only with respect to the statements "there may be some Smoke & Mirrors" and "[b]e aware of the Robinson-Patman Act." These statements represent Czerewko's subjective views of Republic's programs and are not statements that can be objectively verified. On the other hand, the statements that North Atlantic owned the "patent-trademark which has been violated" and that its attorneys had "initiated legal action" regarding this "violation" are objectively verifiable and therefore

actionable.  See Barakat v. Matz, 648 N.E.2d 1033, 1041-42 (Ill.
App. Ct. 1995).

It is undisputed that North Atlantic did not own any patent in
the display boxes.  North Atlantic also admits that it had not
filed suit against Republic or any other party with respect to the
display boxes at the time the Czerewko Letter was sent.  In
addition, Czerewko's supervisor, Ronald Beasley, testified that
Czerewko "consulted" with him on the preparation of the letter and
that Beasley had approved the letter.  (Republic App. II, Vol. I,
Beasley Deposition, at 326.)  Beasley stated that he was "the
impetus" for Czerewko saying that legal action had been initiated
against another chain for a "trademark-patent" violation  even
though no lawsuit had been filed.  (Id. at 326-36.)  The idea was
to "get [Czerewko] to warn Clark Oil that they may be getting into
legal problems by distributing our defaced vendors."  (Id. at 335-
36.)

North Atlantic also contends that the statements in the
Czerewko Letter are not actionable because they can be innocently
construed.  The innocent construction rule provides that a court
should consider whether an arguably defamatory statement, when read
in context, can be construed in a non-defamatory way.  Whether a
statement is reasonably susceptible to an innocent interpretation
is a question of law for the court to decide.  See Bryson, 672
N.E.2d at 1215.  Although only reasonable constructions will be

entertained, if a reasonable innocent construction exists, we must conclude that the statement is not actionable defamation. See id. The test is not whether allegedly defamatory words are "capable" of an innocent construction; rather, we must interpret the words as they appeared to have been used and according to the idea they were intended to convey to the reasonable reader. See id. at 1217. "When a defamatory meaning was clearly intended and conveyed, this court will not strain to interpret allegedly defamatory words in their mildest and most inoffensive sense in order to hold them nonlibellous under the innocent construction rule." Id.

Given these principles, we believe that the statements "[w]e own the patent-trademark which has been violated" and "[o]ur Attorneys initiated legal action regarding this and had to include the Chain in Trademark-Patent violation" are incapable of innocent interpretation. North Atlantic offers no innocent construction of to the first statement, and contends that the second statement is susceptible to innocent construction because North Atlantic's attorneys had already "written to Republic" about the displays and "were investigating the extent of use" of the displays. (North Atlantic Memorandum at 17.) We are unpersuaded. The idea that was conveyed was not that North Atlantic's lawyers had been "looking into the matter" as North Atlantic contends, but that North Atlantic had filed suit against Republic and one of Republic's customers (and implying that Clark could be next if it used the

modified displays). Republic points out that the statements "can be innocently construed only under the theory that Czerewko was offering general advice" about the patent and trademark laws, "rather [than] specifically threatening" that Clark's dealings with Republic could expose it to patent and trademark liability. (Republic Response at 5.) We concur with Republic that a view of the statements as simply offering general advice is unreasonable.

North Atlantic next argues that because the Czerewko Letter was sent only to Clark, Republic could not have suffered the type of serious reputational injury necessary to sustain a defamatory per se claim. To support this proposition, North Atlantic cites Management Services of Illinois, Inc. v. Health Management Systems, Inc., 907 F. Supp. 289, 293 (C.D. Ill. 1995), which held that even if a statement falls within one of the defamation per se categories, the court must still inquire as to whether the defendant's conduct was so severe that serious reputational injury will be presumed without proof of special damages.

We respectfully decline to follow Management Services. We believe that the decision adds an additional hurdle for defamation per se claims that does not exist under Illinois law. The basic issue is whether the statements fall within one of the stated categories. If they do, they constitute defamation per se. A determination that a statement falls into one of the categories already signifies that the defendant's conduct was such that

reputational injury will be presumed. In this court's view, the "severity" of the conduct factors into the consideration of the amount of presumed damages, but not into the threshold issue of whether damages should be presumed at all.

Accordingly, we hold that the statements in the Czerewko Letter that North Atlantic owned the "patent-trademark which has been violated" and that its attorneys had "initiated legal action" regarding this "violation" constitute defamation per se.

### b. **August 13 Letter**

North Atlantic sent the August 13 Letter to its customers, many of whom are also customers of Republic. The letter stated that North Atlantic has filed suit against Republic in Kentucky "charging [Republic] with unfair competition, deceptive trade practices and antitrust violations" and included the allegations. (Republic App. I, Vol. I, Ex. 15.) The August 13 Letter recited in part:

> The complaint alleges that Republic Tobacco's exclusivity agreements, rebates, incentive programs, buybacks and other activities violate federal and state antitrust and unfair competition laws. The complaint charges that Republic Tobacco entered into contracts, combinations and conspiracies in illegal restraint of trade and has attempted to illegally monopolize, and has illegally monopolized, the roll-your-own ("RYO") cigarette paper market in the southeast United States.
>
> The complaint also alleges that Republic Tobacco has defaced and directed others to deface North Atlantic's and National Tobacco's vendor displays for ZIG-ZAG® RYO cigarette papers. On many of these vendors, the ZIG-ZAG® brand name has been covered up with an advertisement for JOB®, TOP® and other Republic Tobacco RYO cigarette

> brands.  The lawsuit alleges that these activities
> violate North Atlantic's and National Tobacco's rights
> and constitute unfair competition under federal and state
> law.

(<u>Id.</u>)  Assuming that the statements in the August 13 Letter are actionable--which we discuss <u>infra</u>--they fall into the third and fourth categories of defamation <u>per se</u>.  The letter accuses Republic of illegal conduct, attacks the integrity of its business conduct, and prejudices Republic in its business.

North Atlantic first asserts that the August 13 Letter is "absolutely privileged" by virtue of the "fair comment rule." Section 611 of the Restatement (Second) of Torts, titled "Report of Official Proceeding or Public Meeting," sets forth this privilege, stating: "The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported."  Restatement (Second) of Torts § 611 (1977).

This privilege is not available to North Atlantic because it seeks to confer the privilege upon itself.  "A person cannot confer this privilege upon himself by making the original defamatory publication himself and then reporting to people what he had stated.  This is true whether the original publication was privileged or not."  <u>Id.</u>, § 611 cmt. c.  Here, North Atlantic made the original defamatory publication and then "reported" the same

matter to customers.  This fact renders the privilege unavailable to North Atlantic.  See Kurczaba v. Pollock, 742 N.E.2d 425, 442-43 (Ill. App. Ct. 2000).  North Atlantic also overlooks the basis of this privilege: "the interest of the public in having information made available to it as to what occurs in official proceedings." Restatement (Second) of Torts § 611, cmt. a.  North Atlantic did not disseminate this information to the public, but rather to its own (and, more importantly, Republic's) customers.

North Atlantic also argues that there is no genuine issue that the statements in the August 13 Letter are truthful because they "accurately summarize the claims set forth in North Atlantic's legal pleadings."  (North Atlantic Memorandum at 17.)  We already considered and rejected this argument in our memorandum opinion of April 8, 1999.  As we stated before, it is evident that North Atlantic was conveying the substance of its allegations to Republic's customers, not the mere fact that the allegations had been made--and the substance of those allegations is what Republic claims to be false.  North Atlantic cannot preface defamatory statements with the words "the complaint alleges" and then claim that the statements are literally true.  For the same reasons, we reject North Atlantic's contention that the August 13 Letter is subject to an innocent construction.

The main issue is whether the August 13 statements are substantially true--whether Republic violated federal and state

antitrust and unfair competition laws. That is the subject of many of North Atlantic's counterclaims, which are discussed _infra_. In our analysis, we conclude that there is no genuine issue that Republic did not violate federal and state antitrust law. Accordingly, it can be said that, as a matter of law, North Atlantic's statements in the August 13 Letter are not substantially true, and that the Letter constitutes defamation _per se_. Summary judgment for Republic on Count VIII is therefore appropriate.

**B.    Defendants' Counterclaims**

Republic moves for summary judgment on all counts of defendants' counterclaim.

### 1.    Counts I, III -- Lanham Act Unfair Competition and Trade Dress Infringement

Republic contends that it is entitled to summary judgment on Counts I and III of North Atlantic's counterclaim, which allege unfair competition and trade dress infringement in violation of the Lanham Act. Republic argues that North Atlantic has failed to create a genuine issue of material fact with respect to likelihood of confusion, one of the elements of the Lanham Act claims. We agree, for the same reasons discussed _supra_ regarding Republic's Count II for declaratory relief: North Atlantic does not offer any evidence that there was actual or likely confusion associated with the modified display boxes. Therefore, summary judgment for Republic is granted on Counts I and III of North Atlantic's counterclaims.

## 2. **Count II -- Lanham Act False Advertising**

Republic moves for summary judgment on Count II, which alleges that Republic's re-labeling of the display boxes constitutes false advertising in violation of the Lanham Act. The law and elements of such Lanham Act claims are set forth supra regarding Republic's Count V. One of those elements is a "false or misleading description" or representation of fact in commercial advertising or promotion. 15 U.S.C. § 1125(a)(1). "The false statement necessary to establish a Lanham Act violation generally falls into one of two categories: (1) commercial claims that are literally false as a factual matter; or (2) claims that may be literally true or ambiguous, but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." Hot Wax, 191 F.3d at 820.

Republic contends that North Atlantic has not shown that the re-labeling was likely to cause consumer confusion and that North Atlantic has not alleged that Republic made any literally false statements. North Atlantic responds that "[b]y using ZIG-ZAG vendor displays stickered over with [Republic's] trademarks, Republic is using a 'symbol' or 'device' that falsely promotes the nature of Republic's products as being sponsored by or affiliated with ZIG-ZAG. . . . This advertising and promotion is literally false." (North Atlantic Response at 48-49.)

As discussed <u>supra</u> regarding the trade dress claims, North Atlantic does not present any evidence regarding likelihood of confusion, so the only issue is whether it has shown a "literally false" statement. We do not believe that the re-labeling constitutes an objective "statement" that can be verified as true or false.[17] Moreover, we agree with Republic that North Atlantic's argument is ridiculous: it would not make sense for Republic to cover North Atlantic's marks with its own marks if it wanted consumers to believe that its products were affiliated with North Atlantic's. Summary judgment for Republic is granted as to Count II of the Counterclaim.

### 3. Counts IV, V, VI -- Federal Antitrust Claims

Counts IV, V, and VI of North Atlantic's counterclaim allege that Republic (1) entered into unlawful agreements in unreasonable restraint of trade in violation of § 1 of the Sherman Act; (2) acted unlawfully to attempt to monopolize and monopolize in violation of § 2 of the Sherman Act; and (3) entered into unlawful exclusive dealing agreements that substantially lessen competition in violation of § 3 of the Clayton Act.

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is hereby declared to be illegal." 15 U.S.C. § 1. Only unreasonable

---

[17]/ It is important to note that Count II alleges false advertising, not false designation of origin.

restraints of trade are prohibited. See BCB Anesthesia Care, Ltd.
v. Passavant Mem'l Area Hosp. Ass'n, 36 F.3d 664, 666 (7th Cir.
1994). The elements of a § 1 claim are (1) a contract, combination
or conspiracy; (2) a resultant unreasonable restraint of trade in
the relevant market; and (3) an accompanying injury. See MCM
Partners, Inc. v. Andrews-Bartlett & Assocs., Inc., 161 F.3d 443,
448 (7th Cir. 1998).

Section 2 of the Sherman Act proscribes monopolization and
attempted monopolization of trade. See 15 U.S.C. § 2. To prove a
monopolization claim under § 2, North Atlantic must demonstrate
that Republic (1) has a monopoly in the relevant market; and (2)
maintained that monopoly through willful anticompetitive conduct as
opposed to superior product, business acumen, or accident. See
United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). To
prove attempted monopolization, North Atlantic must show (1)
Republic's specific intent to monopolize a relevant market; (2)
Republic's anticompetitive conduct to accomplish that unlawful
purpose; and (3) a dangerous probability that the attempt will
succeed. See Indiana Grocery , Inc. v. Super Valu Stores, Inc.,
864 F.2d 1409, 1413 (7th Cir. 1989).

Section 3 of the Clayton Act prohibits the sale of goods on
the condition that the purchaser will not deal in the goods of the
seller's competitor, where the effects of such an arrangement may
be to lessen competition substantially or tend to create a

monopoly.  See 15 U.S.C. § 14.  A determination of the relevant
market is essential under § 3 of the Clayton Act, see Tampa
Electric Co. v. Nashville Coal Co., 365 U.S. 320, 329 (1961), as it
is under the Sherman Act.  In order to prove a § 3 claim, North
Atlantic must show that the likely effect of Republic's exclusivity
agreements is to substantially decrease competition.  See Roland
Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 392 (7th Cir.
1984).  "In the context of exclusive dealing arrangements, . . .
the plaintiff can prevail only by showing that the agreement in
question results in a substantial foreclosure of competition in an
area of effective competition, that is, in a relevant market."  Dos
Santos v. Columbus-Cuneo-Cabrini Med. Ctr., 684 F.2d 1346, 1352
(7th Cir. 1982) (citing Tampa Electric, 365 U.S. at 327-28).

Thus, a determination of the relevant market is necessary for
all of North Atlantic's antitrust claims.  Definition of the
relevant market is a question of fact.  See Kaiser Aluminum & Chem.
Corp. v. FTC, 652 F.2d 1324, 1329 (7th Cir. 1981).  The relevant
market has both a product dimension and a geographic dimension.
See Brown Shoe Co. v. United States, 370 U.S. 294, 324 (1962).  For
summary judgment purposes, the parties agree that the relevant
product market is the market for premium RYO cigarette papers.  The
parties disagree on the relevant geographic market: Republic
contends that the market is nationwide, but North Atlantic argues
that it is limited to the "Southeast" part of the United States.

North Atlantic defines the "Southeast" region as consisting of the nine states east of the Mississippi River and south of the Ohio River--Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee, and Virginia. Republic contends that North Atlantic has not come forward with facts sufficient to demonstrate that the nine-state region it claims is a distinct market is in fact a relevant market.

The traditional definition of the relevant geographic market is the area "of effective competition," "in which the seller operates, and to which the purchaser can practicably turn for supplies." Tampa Electric, 365 U.S. at 327; see also A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc., 881 F.2d 1396, 1403 (7th Cir. 1989) (geographic market includes "the set of sellers to which a set of buyers can turn for supplies at existing or slightly higher prices"). A geographic market is only relevant for monopoly purposes where the evidence shows that purchasers "within the geographic area cannot realistically turn to outside sellers should prices rise within the defined area." T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc., 931 F.2d 816, 823 (11th Cir. 1991).

As for the first part of the definition of a relevant geographic market, where the seller operates, there can be no doubt that Republic and North Atlantic operate nationwide--an area much larger than that proposed by North Atlantic as a relevant geographic market. The second half of the definition is the bone

of contention: the area to which their customers can "practicably turn" for supplies at existing or slightly higher prices.

North Atlantic's economic expert, Professor Morton I. Kamien, and Republic's expert, Professor Daniel L. Rubinfeld, dispute each other's conclusions with respect to the definition of the relevant market. Thus, at first glance, we have a classic "battle of the experts" that usually must be decided in the courtroom. However, a closer review of the expert reports and the evidence presented leads us to conclude that there is no evidence that can support an inference that purchasers within the Southeast could not turn to outside sellers if prices increased in that area. In other words, the evidence does not support a definition of the nine-state Southeast as the relevant geographic market. In fact, the evidence indicates that purchasers can and do turn to outside suppliers.

In an apparent effort to avoid this outcome, North Atlantic and its expert frame the question as follows: where can consumers and retailers turn for alternative sources of premium RYO cigarette papers? All of North Atlantic's evidence and analysis hinges on that framework. This is the wrong question because Republic and North Atlantic do not sell cigarette papers to retailers and consumers. They sell to distributors and wholesalers; therefore, those entities are the "purchasers" for purposes of geographic market analysis. Republic has presented ample evidence that distributors and wholesalers can practicably (and in fact do) turn

to suppliers across the nation for RYO cigarette paper. North Atlantic has failed to present evidence supporting its geographic market definition.

Even if we assumed that retailers (who buy from distributors and wholesalers) and ultimate consumers were "purchasers" for purposes of geographic market definition, North Atlantic and its expert still come up short. Their argument is that those purchasers buy according to a "series of limited overlapping geographic submarkets" and that "it is reasonable to view the Southeast as a regional market comprised of these localized markets." (North Atlantic Response App., Vol. I, Ex. 22, Kamien Expert Report, ¶ 44.) North Atlantic and its expert, however, fail to explain why these "limited overlapping geographic submarkets" can be combined into a regional market and why that regional market consists of the "Southeast."

Thus, there is no genuine issue that the relevant geographic market in this case is a national market. North Atlantic does not argue that Republic has monopolized, attempted to monopolize, unreasonably restrained trade in, or foreclosed competition in the national market for premium RYO cigarette papers. Summary judgment for Republic is therefore appropriate on each of North Atlantic's federal antitrust counterclaims (Counts IV, V, and VI). Because of our determination that North Atlantic has not created a jury question as to the relevant geographic market, we need not reach

the parties' arguments regarding antitrust injury or foreclosure of competition. Accordingly, Republic's motion to exclude North Atlantic's foreclosure and price surveys is moot because those surveys are relevant only to those arguments.

### 4. Count VII -- State Antitrust Claims

The parties agree that our ruling on the federal antitrust claims governs North Atlantic's state antitrust claims. (Republic Memorandum at 39; North Atlantic Response at 45 n.28.) Therefore, summary judgment for Republic is granted on Count VII of North Atlantic's counterclaim.

### 5. Counts VIII, IX -- State Law Claims

Count VIII of the Counterclaim alleges a number of state law claims: unfair competition, violation of the Uniform Deceptive Trade Practices Act, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, trade dress infringement, and palming-off.[18] Count IX alleges tortious interference with business relations and economic advantage. Republic's argument as to these claims consists of one sentence: "[North Atlantic's] other state claims such as tortious interference also fail if their Lanham and

---

[18] Each of these claims should have been alleged in a separate count. Federal Rule of Civil Procedure 10(b) states, in pertinent part, that "[e]ach claim founded upon a separate transaction or occurrence . . . shall be stated in a separate count . . . whenever a separation facilitates the clear presentation of the matters set forth." In keeping with the rule, the courts have required a separate count for each distinctive statutory, constitutional, or common law claim. See Casler v. Janus, No. 97 C 5049, 1998 WL 151811, at *1 (N.D. Ill. Mar. 26, 1998) (citing cases). There are two purposes for requiring separate counts: (1) to give fair notice to the defendants of the claims against them; and (2) to enable the court to grant relief on an entire count, not just part of a count. See id.

antitrust claims fail because Republic's actions were all made through standard and appropriate methods of business competition." (Republic Memorandum at 40-41.)   Republic does not develop this argument at all.   Therefore, its motion for summary judgment on Counts VIII and IX of the Counterclaim is denied.

### 6.   Count X -- Conversion of Property/Trespass to Chattels

Count X is a claim under state law for conversion of property and trespass to chattels.   Conversion is defined as "the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held." Fonda v. General Cas. Co., 665 N.E.2d 439, 442 (Ill. App. Ct. 1996).   The elements of conversion are "(1) an unauthorized and wrongful assumption for control, dominion, or ownership by a defendant over a plaintiff's personalty;   (2) plaintiff's right in the property; (3) plaintiff's right to the immediate   possession   of   the   property,   absolutely   and unconditionally; and (4) a demand for possession of the property." Id. (citing General Motors Corp. v. Douglass, 565 N.E.2d 93 (Ill. App. Ct. 1990)).[19]

---

[19] As an example of North Atlantic's evasive approach to the briefing of these motions, it fails to take an affirmative position as to what state's law applies.   North Atlantic does not take issue with Republic's application of Illinois law, but cites to Kentucky law (without explanation) for the definition of conversion. North Atlantic adds a footnote citing to Tennessee, Michigan, and Illinois law as well and states that "[e]ven if Illinois law applies, North Atlantic's claim satisfies the additional required element: that North Atlantic made a demand to Republic for possession of the displays."   (North Atlantic Response at 49.)   We will apply Illinois law because there is no real dispute that it applies, and because it appears that the conversion claim would fail under Kentucky, Tennessee, and Michigan law anyway.

North Atlantic cannot survive summary judgment on its conversion claim because it provides no evidence that it demanded possession of the vendor displays. The evidence to which it cites for this argument in no way demonstrates that North Atlantic made a demand (to anyone) for possession of the displays.

Moreover, North Atlantic has provided no material evidence that it has the absolute and unconditional right to the immediate possession of the property (and possibly any right at all in the property). The only evidence offered regarding this element of the claim is the testimony that some of the display boxes were embossed with the designation "Property of North Atlantic Trading Company." We find this insufficient to rebut Republic's evidence that North Atlantic failed to retain possession or control of the boxes and exercised no subsequent acts of ownership in them: North Atlantic sold or gave thousands of the displays to customers (containing the RYO cigarette papers that were sold); North Atlantic never told those customers that they were not free to use the boxes as they wished; North Atlantic never demanded any of the boxes back. In short, once the displays containing the RYO cigarette papers were given away or sold, North Atlantic never saw them again and never expressed any interest in seeing them again. Accordingly, summary judgment for Republic is appropriate on Count X of North Atlantic's counterclaim.

## CONCLUSION

For the reasons stated above, Republic's motion for summary judgment on its own claims is granted as to Counts II, III, and VIII of the Second Amended Complaint and denied as to Count V. Republic's motion for summary judgment on North Atlantic's Counterclaim is granted as to Counts I, II, III, IV, V, VI, VII, and X and denied as to Counts VIII and IX. North Atlantic's motion for summary judgment is granted as to Counts IV and VI of the Second Amended Complaint, denied as to Count VIII, and granted in part and denied in part as to Count V. Republic's motion to exclude North Atlantic's foreclosure and price surveys is denied as moot.

With respect to Count VIII of North Atlantic's Counterclaim, a different approach is required because, as discussed supra footnote 18, a number of state law claims have been alleged together in one count. Although we suspect that the foregoing discussion of North Atlantic's other claims would be dispositive of the claims alleged in Count VIII, we cannot so determine given the manner in which they are currently pled. Therefore, we dismiss Count VIII sua sponte with leave to replead the claims in separate counts, stating their factual basis. North Atlantic is given leave to replead the claims alleged in Count VIII by April 15, 2002. Republic is given leave to file a more complete motion for summary judgment (or a Rule 12(b)(6) motion) regarding those claims and

Count IX by April 29, 2002. A status conference is set for May 8, 2002 at 11:00 a.m.

To summarize, the claims that remain to be tried are (1) Republic's Lanham Act claim (Count V of Second Amended Complaint), on which it can obtain only equitable relief; and (2) North Atlantic's tortious interference claim (Count IX of Counterclaim).

DATE:       April 5, 2002

ENTER:      _____

John F. Grady, United States District Judge