IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

JUN 1 3 2003

REPUBLIC TOBACCO, L.P.,              )
                                     )
              Plaintiff,             )
                                     )
         v.                          )     Case No. 98 C 4011
                                     )
NORTH ATLANTIC TRADING COMPANY,      )     Judge John F. Grady
INC., NORTH ATLANTIC OPERATING       )
COMPANY, INC., AND NATIONAL          )
TOBACCO COMPANY, L.P.,               )
                                     )
              Defendants.            )

**FILED**

JUN 1 1 2003

UNITED STATES DISTRICT COURT

THIRD AMENDED COMPLAINT

## PARTIES

1.    Plaintiff Republic Tobacco, L.P. ("Republic") imports and sells roll-your-own cigarette papers, tobacco and other tobacco-related products, including those sold under the TOP and JOB brand names. Republic has its principal place of business at 2301 Ravine Way, Glenview, Illinois.

2. Defendant North Atlantic Trading Company, Inc. ("NATC") is a Delaware corporation with its principal place of business at 257 Park Avenue South, New York, NY. Defendants North Atlantic Operating Company, Inc. ("NAOC") and National Tobacco Company, L.P. ("National") are wholly-owned subsidiaries of NATC. (Collectively, defendants are hereinafter referred to as "North Atlantic." NAOC, a Delaware corporation, imports

cigarette papers and other tobacco-related products sold under
the ZIG-ZAG brand name.  National, a Delaware limited
partnership, distributes and sells ZIG-ZAG cigarette papers,
Beech-Nut loose leaf chewing tobacco, and other tobacco-related
products.

### JURISDICTION AND VENUE

3.    This Court has jurisdiction over this controversy
pursuant to 28 U.S.C. §§ 1337, 1338, and 1367.  There is an
actual controversy between the parties to this action, as set
forth more fully below, upon which Republic seeks a declaration
of rights in addition to such other relief as is sought herein.

4.    Venue is proper in this district under 28 U.S.C.
§1391(b)(2).

### FACTUAL ALLEGATIONS

#### The Market For Cigarette
#### Paper In The United States

5.    Both Republic and North Atlantic market their
cigarette paper through distributors and wholesalers who, in
turn, resell those products to outlets such as gas station/mini-
marts, convenience, drug and variety stores.

6.    North Atlantic and Republic also sell their
cigarette paper directly to independent retailers.  On

information and belief, this accounts for a small percentage of North Atlantic's and Republic's sales.

7.   In a 1997 Offering Memorandum to prospective purchasers of high-yield bonds, North Atlantic declared its dominance in what it described as the "RYO cigarette papers" market. North Atlantic stated that "NATC is the largest importer and distributor in the United States of RYO cigarette papers." North Atlantic also estimated its "domestic market share (by unit volume)" for ZIG-ZAG papers at 49% of the total market. "ZIG-ZAG has been the number-one selling domestic RYO cigarette paper brand since [the] introduction of the brand in the United States in 1938," North Atlantic claims.

8.   North Atlantic's dominance of the cigarette paper market is protected by "significant barriers to entry," according to the company's SEC filings. North Atlantic admits that it has historically enjoyed strong relationships with its customers, in part due to its "significant market share."

9.   In a presentation at a July, 1998 conference on high-yield bonds, North Atlantic estimated Republic's market share at less than 25%.

10.   Following a leveraged buyout financed with high-yield junk bonds in 1997, North Atlantic has made serious efforts

to interfere with Republic's customer relationships by disparaging Republic's trade programs and practices. North Atlantic's goal, as expressed in its 1997 Offering Memorandum, is to increase its own share of the national market for cigarette paper and to use its existing market dominance to raise prices twice a year by 5-7%. North Atlantic's 1997 Offering Memorandum assumes that such price increases can be sustained as a means of servicing its substantial debt load.

## Republic's Trade Programs And Practices

### A.   Republic's Incentive Programs

11.   Republic offers certain incentive programs to distributors with field personnel selling to retail accounts ("distributors") and to convenience stores buying from distributors or grocery wholesalers.

12.   The Republic Tobacco Value-added Rebate Incentive Program ("VRIP") is a program to provide incentives to distributors for stocking, promoting and selling Republic Tobacco products to their retail accounts. A copy of a sample VRIP agreement is attached as Exhibit A. Certain proprietary information has been redacted.

13.   The Republic Tobacco Convenience Store Distribution Incentive Program ("CDIP") is a distribution

-4-

incentive program for convenience stores for stocking and selling Republic's products. A copy of a sample CDIP agreement is attached as Exhibit B. Certain proprietary information has been redacted.

14. Republic also offers certain travel incentive programs to distributors and convenience stores. Details of the Republic Tobacco 1998 Travel Plus Program are set forth in Exhibit C, attached hereto. An example of the Republic Tobacco 1998 C-Store Travel Rewards Program is attached as Exhibit D. (Collectively, the "Travel Programs.") Certain proprietary information has been redacted.

15. The VRIP, CDIP and Travel Programs (the "Incentive Programs") provide incentives for distributors and convenience store sellers of Republic products to vigorously represent Republic's products in the marketplace and to compete more effectively with products marketed by others, including North Atlantic. In various forms, these programs have been in place for many years, and are an important part of Republic's marketing program.

16. As described in more detail below, North Atlantic has contacted many of Republic's customers both orally and in writing, and told those customers that Republic's incentive

programs violated federal and state antitrust and unfair competition laws. North Atlantic's statements were designed to interfere with Republic's customer relationships by causing customers to be concerned about the legality of the programs and to believe that Republic would be unable to honor its obligations under the programs.

B. <u>Republic's Use Of Display Boxes</u>

17. From time to time, North Atlantic and its predecessors sold ZIG-ZAG products in limited promotional runs, packaged in a plastic display box. Most of the display boxes are off-white, though some are colored. In return for buying the products inside, a customer receives the display box. The customer then owns the display box, which is neither patented nor trademarked.

18. Certain Republic customers wanted to use the display boxes to display and sell Republic's cigarette paper. To accommodate these customers, located primarily in Illinois, Indiana, Michigan and Ohio, Republic obtained unused boxes from the inventory of third party distributors. Republic relabeled the display boxes with its own labels, restocked the display boxes with Republic product, and made them available to customers who requested them.

-6-

19.   Some of the display boxes were purchased by Republic's sister company, Adams Apple Distributing Company ("Adams Apple"), directly from U.S. Tobacco.  At the time, U.S. Tobacco was the national importer and distributor of ZIG-ZAG papers, and Jack Africk, now President of North Atlantic, was U.S. Tobacco's Vice Chairman and Executive Vice President.  U.S. Tobacco provided the display boxes to Adams Apple without any restrictions on their use.

20.   As described in more detail below, North Atlantic has contacted many of Republic's customers and asserted that Republic's refurbishment of the display boxes violated patent and trademark laws.  North Atlantic also threatened these customers by stating that they might be subject to a lawsuit for continuing to use the boxes.  North Atlantic made similar threats to distributors who stock the display boxes, stating that North Atlantic would sue them if they sold any display boxes to Republic for refurbishment, even distributors that had never sold any display boxes to Republic.

-7-

### North Atlantic's Pattern Of Anticompetitive Conduct Directed At Republic's Customers

#### A.   Eby-Brown and Clark

21.   One major distributor with which Republic had a contract to distribute its products is Eby-Brown ("Eby-Brown"), of Naperville, Illinois.  Eby-Brown buys products from Republic and re-sells them to retail locations.  For the past three years, Republic's sales to Eby-Brown and its affiliates have averaged more than $700,000 per year.  Eby-Brown also buys cigarette papers and other products from North Atlantic.

22.   One major account to whom Eby-Brown distributes Republic's products is Clark Refining and Marketing Company ("Clark"), an extensive and well-known gas station/convenience store chain.  Through its well-known network of Midwestern gas station/convenience stores, Clark sells approximately $500,000 of Republic's products to retail customers per year.

23.   On or about January 26, 1998, North Atlantic's Director of Sales for the Midwest, John Czerewko ("Czerewko"), sent a letter to Clark (the "Czerewko letter").  A copy of the letter is attached as Exhibit E.  On information and belief, Clark forwarded a copy of the Czerewko letter to its supplier, Eby-Brown.

-8-

24.  The Czerewko letter reports that North Atlantic owns the "patent-trademark" for the plastic display boxes provided for use to Clark and other retail accounts selling Republic's products.  The letter states:

> "We own the patent-trademark which has been violated.  Our Attorneys initiated legal action regarding this and had to include the Chain [that had used the display units] in Trademark-Patent violation."

25.  At the time the statements were made, North Atlantic held no patent in the display boxes, had no trademark rights in the refurbished display boxes, and had not initiated litigation against Republic or anyone else in connection with the display boxes.  North Atlantic knew these statements were false when made.

26.  The Czerewko letter also disparages Republic's Incentive Programs.  North Atlantic describes the "Republic Proposal" as "Smoke & Mirrors" and threatens:  "Be aware of the Robinson-Patman Act . . . ."

27.  These statements from the Czerewko letter are also false.  Republic's Incentive Programs do not violate the federal antitrust laws, or any state laws regulating trade practices.

28.  North Atlantic made the statements in the Czerewko letter to interfere with important customer relationships,

-9-

unlawfully divert sales from Republic's products to North
Atlantic's products, and threaten Republic's customers with
litigation for continuing to use display boxes bearing the trade
dress of Republic's products and participate in Republic's
Incentive Programs.

29.    After many years of participation in Republic's
Incentive Programs, Eby-Brown discontinued its participation in
Republic's Value-added Rebate Incentive Program, described above,
after receiving the Czerewko letter from Clark.

30.    North Atlantic's interference continued.   On
May 28, 1998, Curtis J. O'Rourke, Vice-President of Merchandising
for Eby-Brown, wrote a memorandum to Republic (the "May 28
memorandum").   A copy of the memorandum is attached as Exhibit F.
On information and belief, Eby-Brown discussed the substance of
the May 28 memorandum with Clark.

31.    The May 28 memorandum reports that North Atlantic
told Eby-Brown that the display boxes provided for use by retail
accounts selling Republic's products had been patented by North
Atlantic, and that North Atlantic claimed a property interest in
the plastic display boxes even after the boxes had been sold (or
given) to third parties.

-10-

32.   The May 28 memorandum also reports that North
Atlantic has threatened to take legal action "to enforce their
patents against the parties responsible."  On the basis of North
Atlantic's false and misleading statements, Eby-Brown told
Republic that Republic had "put both our company and one of our
most valued customers, Clark Refining and Marketing, in a very
bad position.  You can expect us to cooperate fully with any NATC
investigations into this matter."

33.   North Atlantic's reported assertions are false,
misleading and were made for the purpose of interfering with
Republic's business relationships with Eby-Brown and Clark.
Defendants knew these statements were untrue at the time they
were made.

34.   After receiving the Czerewko letter and discussing
the contents of the May 28 memorandum with Eby-Brown, Clark
discontinued its participation in the Convenience Store
Distribution Incentive Program.  Like Eby-Brown, Clark had been a
long-time participant in Republic's incentive programs, until
North Atlantic's interference.

B.   Garber And Other Nationwide Distributors

35.   Republic also received reports from its sales
representatives in Michigan that North Atlantic had told other

-11-

customers·it was suing Republic over the use of the relabeled

plastic display boxes.

36.  On information and belief, North Atlantic made the
same misrepresentations to these customers that it had made to
Eby-Brown and Clark, namely that it holds a patent and trademark
rights for the display boxes, and that Republic and its customers
were infringing these rights.

37.  Further, on July 27 and 28, 1998, Jay Martin,
Chief Operating Officer of North Atlantic, traveled to the O'Hare
Hilton in Chicago, Illinois, where he met with the following five
nationwide distributors of tobacco products:  Mackoul
Distributors, Inc., of Jacksonville, Florida; J.T. Davenport &
Sons, Inc., of Sanford, North Carolina; S. Abraham & Sons, Inc.,
of Grand Rapids, Michigan; Harrison Company, of Bossier City,
Louisiana; and  Garber Brothers, Inc., of Randolph, Massachusetts
("Garber").

38.  Each of these nationwide distributors was a
Republic customer at the time of this meeting.

39.  During the meeting, Mr. Martin reportedly stated
that Republic's trade programs were illegal.  He also told these
distributors that North Atlantic had initiated litigation against
Republic.  Mr. Martin did not tell the distributors that Republic

-12-

had first filed this lawsuit to protect its customers from North Atlantic's unlawful interference and for declaratory and other relief.

40. Less than two months later, one of the distributors at the meeting, Garber, informed Republic that it was discontinuing its participation in Republic's VRIP and travel programs, and that it anticipated no future purchases of JOB cigarette papers. Until North Atlantic's interference, Garber had been a long-time participant in Republic's incentive programs.

### C. The August 13 Letter

41. Most recently, North Atlantic sent a letter to its customers throughout the country, many of whom are also Republic customers, repeating its allegations that Republic's use of the relabeled display boxes violate unspecified "rights" and "constitute unfair competition under federal and state law." A copy of this letter, dated August 13, 1998 ("the August 13 letter"), is attached as Exhibit G.

42. With respect to Republic's Incentive Programs, the August 13 letter states that Republic's "exclusivity agreements, rebates, incentive programs, buy backs and other [unspecified]

-13-

activities violate federal and state antitrust and unfair
competition laws."

43. By falsely stating that Republic's trade programs
are unlawful, North Atlantic's letter suggests that Republic will
be unable to honor its obligations under those programs. At
least ten Republic customers who received the August 13 letter
have contacted Republic to inquire about the status of Republic's
Incentive Programs, including whether Republic would continue
providing benefits under the programs, and whether the programs
are legal.

44. The August 13 letter also states that North
Atlantic sued Republic in Kentucky on July 15, 1998, without
reporting that Republic had first filed this action on June 30,
1998, seeking relief from North Atlantic's unlawful interference
with Republic's customer relationships.

45. North Atlantic made these statements to Republic's
customers for the unlawful purpose of threatening and coercing
them to diminish or cease doing business with Republic and to
resume or increase the amount of business they do with North
Atlantic.

46. North Atlantic's campaign of anticompetitive
conduct, frivolous allegations of patent, trademark and antitrust

-14-

violations and threats of litigation against Republic's customers, have interfered with Republic's relationships with its customers. Since North Atlantic began its campaign of making false statements about Republic's business practices, Eby-Brown, Clark and Garber have discontinued their participation in Republic's Incentive Programs. On information and belief, North Atlantic's misstatements have caused and will continue to cause Republic to lose sales and discourage other Republic customers from participating in Republic's Incentive Programs. North Atlantic's intent is to dissuade Republic's customers from continuing to try to meet their sales goals under Republic's Incentive Programs and to divert these sales to North Atlantic's products.

### D. Direct Threats

47. Throughout this period, while North Atlantic was threatening and misleading Republic's customers, it was also making direct threats of litigation to Republic. North Atlantic accusations concerning the display boxes started in November, 1997, less than six months after NATC acquired National. The accusations continued into December, 1997, and then abruptly stopped, without North Atlantic initiating any litigation.

-15-

48. On or about March 16, 1998, North Atlantic's president, Jack Africk, and senior legal officer, Jeffrey Hay, met with Republic's senior legal officer, Seth Gold, and others, at the O'Hare Ramada Hotel in Chicago. During this meeting, and on subsequent occasions, Mr. Africk and Mr. Hay told Mr. Gold that North Atlantic considered the Republic incentive programs to be unlawful and detrimental to North Atlantic's business. When pressed, Mr. Hay could not articulate a specific legal theory that supported North Atlantic's position. Nevertheless, Mr. Africk and Mr. Hay threatened to file suit against Republic to prevent Republic from continuing to offer these programs.

49. The direct threats continued until June, 1998, at which time Republic received additional reports that North Atlantic had told Republic's customers that Republic's Incentive Programs and use of the display boxes were illegal, misrepresented that North Atlantic had already filed suit against Republic and implied that Republic's customers would become involved in the litigation if they continued to participate in Republic's trade programs.

50. This action was filed on June 30, 1998, at which time North Atlantic still had not sought a judicial remedy.

E. **North Atlantic's Anticompetitive Pricing Practices**

51. North Atlantic's pricing practices also are
designed to, and do, cause injury to competition in the market
for cigarette papers. North Atlantic has leveraged ZIG-ZAG's
market power to increase prices much faster than the rate of
inflation. To pay the debt incurred in its 1997 leveraged
buyout, North Atlantic announced its intention to raise prices
every six months. Counting the announced price increase
effective in September, 1998, ZIG-ZAG's prices have risen 21%
since December, 1996 and are now 25% higher than the price for
JOB, a trend that North Atlantic "expects . . . to continue."

52. North Atlantic prices products of like grade and
quality differently and uses differential pricing to reinforce
its market share. For example, comparable distributors in
Illinois who purchase comparable volumes of ZIG-ZAG product are
offered different prices. On information and belief, North
Atlantic has also engaged in differential pricing practices among
distributors in California, in Florida, in Michigan, and in
Texas.

53. Part of North Atlantic's "near term strategy"
disclosed to investors in June, 1997, is "strengthened regional
market penetration for the ZIG-ZAG brand" and "continued

-17-

aggressive promotional strategies."  One of the ways North Atlantic intends to do this is to "leverage complementary distribution channels" of its new subsidiary, National, which distributes Beech-Nut loose leaf chewing tobacco.

54.  North Atlantic admits that, by combining the Beech-Nut and ZIG-ZAG brands, it expects to "become a more important source of supply to major distributors and retailers." Based on statements made by NATC in its offering memorandum and other publications, National exercises market power in the market for loose leaf chewing tobacco and expects to use that power to increase its share in the cigarette paper market.

55.  On information and belief, National has made promotions of Beech-Nut products available only to customers which also agree to purchase ZIG-ZAG products, making purchase of both products the only viable economic option.  North Atlantic recently disclosed that, by implementing these leveraging tactics, it has opened 16,000 new retail locations in Beech-Nut's core food and mass merchandising channels, and added 108 new tobacco distributors of ZIG-ZAG.

COUNT I

Declaratory Relief — Patent Claims

56. Republic incorporates paragraphs 1-55 of the Second Amended Complaint as if fully set forth herein.

57. Pursuant to 28 U.S.C. §2201(a), an actual controversy between the parties exists, and Republic seeks an order declaring its rights in the refurbished and re-labeled plastic display boxes.

58. More specifically, Republic seeks an order declaring:

(a) North Atlantic holds no valid patent in connection with the display boxes.

(b) Republic has not infringed upon any valid patent. Defendants have no legally enforceable patent or proprietary rights in display boxes, which North Atlantic and its predecessors had previously conveyed to third-parties without restriction and which were then re-sold to Republic for refurbishing and re-labeling.

(c) Once sold to Republic and fashioned with Republic's trademarks and trade dress, the display boxes may be used by Republic and Republic's customers for whatever lawful purpose they desire, free from interference by defendants.

-19-

## COUNT II

### Declaratory Relief — Trademark Claims

59.   Republic incorporates paragraphs 1-58 of the Second Amended Complaint as if fully set forth herein.

60.   Pursuant to 28 U.S.C. §2201(a), an actual controversy between the parties exists, and Republic seeks an order declaring its rights in the refurbished and re-labeled plastic display boxes.

61.   More specifically, Republic seeks an order declaring:

(a) North Atlantic holds no valid trademark in connection with the display boxes.

(b) Republic has not infringed upon any valid trademark.  Defendants have no protectable interest in the display boxes, which North Atlantic had previously conveyed to third-parties without restriction and which were then re-sold to Republic for refurbishing and re-labeling.

(c) Once sold to Republic and fashioned with Republic's trademarks and trade dress, the display boxes may be used by Republic and Republic's customers for whatever lawful purpose they desire, free from interference by defendants.

COUNT III

Declaratory Relief — Incentive Programs

62.    Republic incorporates paragraphs 1-61 of the Second Amended Complaint as if fully set forth herein.

63.    Pursuant to 28 U.S.C. §2201(a), Republic seeks an order declaring its rights with regard to the lawfulness of its Incentive Programs.

64.    More specifically, Republic seeks an order declaring that its Incentive Programs do not violate the federal antitrust laws, including the Sherman Act, the Clayton Act or the Robinson-Patman Act.

65.    Republic seeks an order declaring that its Incentive Programs do not violate any laws regulating trade practices in Illinois or any other state.

COUNT IV

Tortious Interference With Customer Relationships

66.    Republic incorporates paragraphs 1-65 of the Second Amended Complaint as if set forth fully herein.

67.    At all times relevant hereto, a valid and ongoing business relationship existed between Republic and its customers, including Eby-Brown, Clark, Garber, and others.

-21-

68.  North Atlantic is aware of Republic's ongoing business relationships with these entities.

69.  By its wrongful, intentional and unjustified acts, North Atlantic has sought to induce and has induced Eby-Brown, Clark, Garber and other customers to end or diminish certain business relationships with Republic and to divert their business to North Atlantic.

70.  As a result of North Atlantic's wrongful, intentional and unjustified acts, Republic's interest in its relationships with these customers has been damaged, impaired and diminished, and Republic has been damaged thereby.  The damage to Republic includes lost sales and interference with continued participation in Republic's incentive programs.

### COUNT V

### Lanham Act § 43(a) — False Advertising

71.  Republic incorporates paragraphs 1-70 of the Second Amended Complaint as if set forth fully herein.

72.  North Atlantic's false and misleading statements to Republic's customers, including that (i) North Atlantic has valid patent and trademark rights in the refurbished plastic display boxes; (ii) use of the refurbished boxes by Republic and its customers infringes North Atlantic's property rights; and

-22-

(iii) Republic's trade programs are illegal and, by implication, unenforceable, constitute commercial advertising or promotion in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

73. These statements are likely to deceive a substantial number of Republic's customers, and have actually deceived Eby-Brown as reflected in the May 28 memorandum.

74. The legality of Republic's trade practices and programs is a material consideration for distributors and retailers who must decide whether to purchase Republic's products, how much of Republic's product to purchase, and how to promote Republic's products to the ultimate consumer.

75. North Atlantic's false and misleading statements about essential characteristics of its own goods, as well as Republic's goods, services and commercial activities, are likely to and have impacted Republic's sales, injured its business relationships and damaged Republic's reputation in the industry. The damage to Republic's customer relationships and reputation constitute irreparable harm for which Republic has no adequate remedy at law.

76. Pursuant to Section 34 of the Lanham Act, 15 U.S.C. § 1116, Republic seeks injunctive relief restraining North

-23-

Atlantic from making false or misleading statements to Republic's customers about North Atlantic's property rights in the refurbished display boxes, Republic's rights in the display boxes or Republic's trade programs.

77.  Pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117(a), Republic seeks to recover any profits North Atlantic received and damages Republic incurred as a result of North Atlantic's unlawful conduct, as well as Republic's litigation costs.

COUNT VI

Uniform Deceptive Trade Practices Act

78.  Republic incorporates paragraphs 1-77 of the Second Amended Complaint as if set forth fully herein.

79.  North Atlantic's false and misleading statements to Republic's customers disparage Republic's goods, services or business, and create a likelihood of misunderstanding, in violation of Section 2 of the Uniform Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/2.

80.  Pursuant to Section 3 of the UDTPA, Republic seeks injunctive relief, restraining North Atlantic from making false and misleading statements to Republic's customers about North Atlantic's own property rights in the refurbished display boxes,

-24-

Republic's rights in the display boxes or Republic's trade programs.

## COUNT VII

### Consumer Fraud Act

81. Republic incorporates paragraphs 1-80 of the Second Amended Complaint as if set forth fully herein.

82. North Atlantic's campaign of making false and misleading statements to Republic's customers about Republic's trade programs and refurbished display boxes constitutes an unfair method of competition and an unfair or deceptive trade practice in violation of Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 515/2 ("Consumer Fraud Act").

83. Pursuant to Section 10a of the Consumer Fraud Act, Republic seeks to recover the damages it incurs as a result of North Atlantic's unlawful conduct, plus its reasonable attorneys' fees and costs.

## COUNT VIII

### Defamation

84. Republic incorporates paragraphs 1-83 of the Second Amended Complaint as if set forth fully herein.

-25-

85. North Atlantic's false and misleading statements to Republic's customers about Republic's refurbished display boxes and trade programs constitute trade libel and commercial disparagement.

86. North Atlantic's defamatory statements have damaged Republic's reputation in the trade, caused Republic to lose sales, and unlawfully injured Republic's customer relationships.

COUNT IX

Unfair Competition

87. Republic incorporates paragraphs 1-86 of the Second Amended Complaint as if set forth fully herein.

88. North Atlantic's false and misleading statements to Republic's customers about Republic's refurbished display boxes and trade programs constitute unfair competition.

89. North Atlantic's defamatory statements have damaged Republic's reputation in the trade, caused Republic to lose sales, and unlawfully injured Republic's customer relationships.

## COUNT X

### Unlawful Monopolization And Attempt To
### Monopolize In Violation Of Section 2 Of The Sherman Act

90.   Republic incorporates paragraphs 1-87 of the
Second Amended Complaint as if set forth fully herein.

91.   The relevant market is the nationwide market for
distribution of cigarette papers.  North Atlantic maintains a
market share of approximately 50% in this market.  According to
North Atlantic, Republic's market share is less than 25%.

92.   North Atlantic has engaged in anticompetitive and
deceptive business practices with the specific intent to
monopolize the national market for cigarette papers.  Those
actions include, but are not limited to, disparaging Republic's
incentive programs to customers and potential customers,
suggesting to Republic's customers that Republic violated patent
laws by refurbishing display boxes and threatening to sue
Republic's customers for patent and trademark violations, using
unlawful pricing strategies and attempting to tie purchases of
products to purchases of the products of North Atlantic's sister
company.

93.   Through those actions, North Atlantic has
attempted to monopolize the national market for cigarette papers.

-27-

94.  North Atlantic has in fact successfully monopolized the national market for cigarette papers, or alternatively, has created a dangerous probability of monopolizing such market, each in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

95.  As a direct and proximate result of the conduct described above, Republic has suffered significant damages. Unless North Atlantic is enjoined from continuing its unlawful conduct, Republic will continue to suffer irreparable harm for which it has no adequate remedy at law, and competition in the national market for cigarette papers will continue to be suppressed and unlawfully restrained.

96.  Republic is entitled to treble damages, attorneys' fees and injunctive relief pursuant to 15 U.S.C. §§15 and 26.

COUNT XI

Unlawful Monopolization And Attempt To Monopolize
Regional Markets In Violation Of Section 2 Of The Sherman Act

97.  Republic incorporates paragraphs 1-96 of the Second Amended Complaint as if set forth fully herein.

98.  In the Counterclaim filed in this action, North Atlantic has alleged that distinct geographic submarkets exist for the sale of cigarette papers.  North Atlantic alleges that,

-28-

"[t]here are one or more separately-defined, distinct and
identifiable markets for RYO cigarette papers in the southeast,
existing as a result of the methods of distribution and size and
location of the participants in the market(s)." North Atlantic
alleges that the "Southeast market(s)" consist(s) of "consumers
in the southeastern states of the United States (i.e., Alabama,
Florida, Georgia, Kentucky, Mississippi, North Carolina, South
Carolina, Tennessee, Virginia and West Virginia)." North
Atlantic further alleges that "Republic maintains at least a
ninety percent (90%) or more market share in the Southeast."

99. Republic believes that the market for cigarette
papers is properly viewed as national in scope. However,
recognizing that views may differ, and pursuant to Rule 8(e)(2)
Fed.R.Civ.P., Republic pleads in the alternative that if there
are distinct regional submarkets for cigarette papers, it is
North Atlantic, not Republic, that has monopolized or attempted
to monopolize most of the nation's regional submarkets.

100. North Atlantic has monopoly power in many states.
North Atlantic claims: "Zig Zag sales are strongest in the
Southwest, West and Midwest Regions with approximate share of
market percentages at 86%, 96% and 55% respectively." North
Atlantic sells more than 80 percent of all cigarette papers sold

-29-

outside of what North Atlantic calls the "Southeast Region" (where consumers prefer Republic's products) and the "Northeast Region" (where the products of a third competitor, Robert Burton & Associates ("RBA") are most popular). Moreover, North Atlantic claims that its share of the cigarette paper market(s) has been growing in recent years.

101. North Atlantic has engaged in the anticompetitive and deceptive business practices described above and others with the specific intent to maintain its monopoly, or to monopolize the alleged regional market(s) for cigarette papers.

102. Through its actions, North Atlantic has in fact successfully monopolized the market for cigarette papers in all or some of the states comprising North Atlantic's self-designated Southwest, West and Midwest regions and has created a dangerous probability of success in monopolizing the other alleged regional market(s) for cigarette papers. North Atlantic now seeks to leverage, extend and exercise its monopoly power into other states and other regions.

103. As a direct and proximate result of North Atlantic's unlawful conduct, Republic has suffered proprietary and pecuniary business losses and has been unreasonably foreclosed from entering the alleged regional market(s) for

-30-

cigarette papers outside the Southeast.  Unless North Atlantic is

enjoined from continuing its unlawful monopoly and attempted

monopolization, Republic will continue to suffer irreparable harm

for which it has no adequate remedy at law, and competition in

the aforesaid market(s) will continue to be suppressed and

unlawfully restrained.

104. Under Sections 4 and 16 of the Clayton Act, 15

U.S.C. §§15 and 26, Republic is entitled to a judgment for three

times its damages resulting from North Atlantic's unlawful

anticompetitive conduct, and to an Order enjoining any further

antitrust violations by North Atlantic.

### COUNT XII

### Restraint Of Trade, Monopolization And
### Attempted Monopolization In Violation Of State Law

105. Republic incorporates paragraphs 1-104 of the

Second Amended Complaint as if set forth fully herein.

106. North Atlantic's conduct described herein

constitutes a restraint of trade, monopolization and attempted

monopolization of the market(s) for cigarette paper in the states

comprising North Atlantic's West, Southwest, and Midwest Regions.

107. In the region that North Atlantic has denominated

as the "West," North Atlantic's conduct violates state antitrust

-31-

statutes including, but not limited to: Alaska Stat.
§§45.50.471, 45.50.562 to 45.50.596 (Michie 1996); Ariz. Rev.
Stat. Ann. §§44-1401 to 44-1416 (West 1994); Cal. Bus. & Prof.
Code §§16700-16770, 17200-17209 (West 1997 & Supp. 1998); Colo.
Rev. Stat. §§6-2-101 to 6-2-117, 6-4-101 to 6-4-122 (1997); Haw.
Rev. Stat. §§480-1 to 480-24, 481-1 to 481-11 (1993); Idaho Code
§§48-101 to 48-119 (1997); Mont. Code Ann. §§30-14-201 to
30-14-225 (1997); Nev. Rev. Stat. §§598A.010 to 598A.280 (1997);
Or. Rev. Stat. §§646.705 to 646.836 (1995); Utah Code Ann. §§76-
10-911 to 76-10-926 (1995 & Supp. 1997); Wash. Rev. Code
§§19.86.010 to 19.86.920 (1996).

108. In the region that North Atlantic calls the
"Southwest," North Atlantic's conduct violates state antitrust
statutes including, but not limited to: Ark. Code Ann. §§4-75-
201 to 4-75-211 (Michie 1996); La. Rev. Stat. Ann. §§51:121 to
51:152 (West 1987 & Supp. 1998); Miss. Code Ann. §§75-21-1 to 75-
21-39 (1991); N.M. Stat. Ann. §§57-1-1 to 57-1-19 (Michie 1995);
Okla. Stat. Ann. tit. 79, §§201 to 212 (1998); Tex. Bus. & Com.
Code Ann. §§15.01 to 15.40 (West 1987 & Supp. 1998).

109. In the region that North Atlantic characterizes as
the "Midwest," North Atlantic's conduct violates state antitrust
statutes including, but not limited to: 740 Ill. Comp. Stat.

-32-

10/1 to 10/11 (West 1997); Ind. Code §§24-1-1-1 to 24-1-1-6,
24-1-2-1 to 24-1-2-12 (1993); Iowa Code Ann. §§553.1 to 553.18
(West 1997); Kan. Stat. Ann. §§50-101 to 50-157, 50-801 (1995);
Mich. Comp. Laws Ann. §§445.771 to 445.788 (West 1989 & Supp.
1997); Minn. Stat. §§325D.43 to 325D.66 (1996 & Supp. 1997); Mo.
Rev. Stat. §§416.011 to 416.161 (1994); Neb. Rev. Stat. §§59-801
to 59-831 (1993); N.D. Cent. Code §§51-08.1-01 to 51-08.1-12
(1989 & Supp. 1997); Ohio Rev. Code Ann. §§1331.01 to 1331.99
(Banks-Baldwin 1994 & Supp. 1997); S.D. Codified Laws §§37-1-3.1
to 37-1-33 (Michie 1994); Wis. Stat. Ann. §§100.20 (West 1997),
§§133.01 to 133.18 (West 1989 & Supp. 1997).

110. Republic is entitled to all appropriate relief
available under these state antitrust laws, including injunctive
relief, treble damages, attorneys fees and costs.

## PRAYER FOR RELIEF

Wherefore, plaintiff Republic Tobacco, L.P. seeks
judgment:

1) declaring its rights to continue to use and
distribute plastic display boxes adorned with its own
trade dress, free from the specious, unfounded and
misleading claims that North Atlantic has some

-33-

continuing patent, trademark or other proprietary
interest in the display boxes;

    2)   declaring that no federal antitrust or state
antitrust or trade practices law is violated by Republic's
Incentive Programs;

    3)   enjoining North Atlantic from further
violations of § 43(a) of the Lanham Act, and the
Uniform Deceptive Trade Practices Act, 815 ILCS 510/2,
and the common law of Illinois through false,
deceptive, misleading and defamatory statements to
Republic's customers about the plastic display boxes
and Republic's incentive programs;

    4)   awarding damages arising out of North
Atlantic's defamatory statements, unfair competition,
and intentional, wrongful and unjustified interference
with Republic's business relationships, including
without limitation its relationships with Eby-Brown,
Clark and Garber;

    5)   awarding damages pursuant to Section 10a of
the Consumer Fraud Act and Section 43(a) of the Lanham
Act, which Republic incurs as a result of North

-34-

Atlantic's unlawful conduct, plus its reasonable attorneys' fees and costs;

6)     awarding damages arising out of North Atlantic's violations of the state and federal antitrust laws, including treble damages and attorneys' fees;

7)     awarding exemplary or punitive damages;

8)     awarding Republic its costs; and

9)     such relief as the Court deems just and lawful


Dated this 11<u>th</u> day of June, 2003

_____
One of the Attorneys for
Republic Tobacco, L.P.

OF COUNSEL:
Charles S. Bergen
Lynn H. Murray
Michael Kazan
Grippo & Elden
227 West Monoroe
Suite 3600
Chicago, Illinois 60606
(312) 704-7700

# SEE CASE FILE FOR EXHIBITS