# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 4011 | **DATE** | November 20, 2003 |
| **CASE TITLE** | Republic Tobacco v. North Atlantic Trading Co., et al. | | |

**MOTION:**   [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)   ☐   Filed motion of [ use listing in "Motion" box above.]

(2)   ☐   Brief in support of motion due _____.

(3)   ☐   Answer brief to motion due_____. Reply to answer brief due_____.

(4)   ☐   Ruling/Hearing on _____ set for _____ at _____.

(5)   ☐   Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)   ☐   Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)   ☐   Trial[set for/re-set for] on _____ at _____.

(8)   ☐   [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)   ☐   This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
         ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10)  ■   [Other docket entry]   North Atlantic's motion for remittitur or a new trial [209-1] is granted. The compensatory damages award is remitted to $3.36 million, and the punitive damages award is remitted to $4.08 million. If Republic refuses to accept either or both of the remittiturs, a new trial will be granted on the award or awards for which remittitur is refused. Republic should file a statement by December 10, 2003, indicating whether it accepts the remittiturs. ENTER MEMORANDUM OPINION.

(11)       [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | Murray,Lynn@5581195; Durbin,Mark@2012555; | | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| x | Notices mailed by judge's staff. | | NOV 21 2003 | |
| | Notified counsel by telephone. | | date docketed | 235 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to _____ | | date mailed notice | |
| KAM | courtroom deputy's initials | Date/time received in central Clerk's Office | KAM mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

**NOV 2 1 2003**

REPUBLIC TOBACCO, L.P.,          )
                                 )
        Plaintiff,               )
                                 )
    v.                           )      No. 98 C 4011
                                 )
NORTH ATLANTIC TRADING COMPANY,  )
INC., et al.,                    )
                                 )
        Defendants.              )

## MEMORANDUM OPINION

At the summary judgment stage of this case, this court found that as a matter of law, defendant North Atlantic Trading Company, Inc. and its affiliates (collectively, "North Atlantic") defamed plaintiff Republic Tobacco, L.P. ("Republic") through the publication of two letters. The damages issue was tried by a jury, which awarded Republic compensatory damages of $8.4 million and punitive damages of $10.2 million. North Atlantic has moved for remittitur or a new trial, arguing that both damages awards are excessive.

## BACKGROUND

Republic imports and sells tobacco, roll-your-own ("RYO") cigarette papers, and other tobacco-related products. North Atlantic is Republic's direct competitor. The following relevant

235

facts and history of this case are taken from our Memorandum
Opinion of April 9, 2002:

Republic and North Atlantic sell their RYO cigarette
paper to distributors and wholesalers, who resell the
products to outlets such as convenience, drug, and
variety stores and gas station/mini-marts. As part of
its marketing strategy, Republic offers certain incentive
programs to these customers for stocking, selling (and
promoting, in the case of distributors) Republic's
products. Customers joining these programs can receive
rebates, free products, and free travel in exchange for
stocking or promoting specified amounts of Republic's RYO
cigarette paper brands and meeting certain sales goals.

### Display Boxes

North Atlantic and its predecessors sometimes sold
their RYO cigarette papers in limited promotional runs,
packaged in a plastic display box. Customers received
the display box along with their purchase of the products
inside. Some of Republic's customers wanted to use the
boxes to display and sell Republic's cigarette papers, so
Republic obtained unused boxes from third-party
distributors. Then Republic re-labeled the boxes with
its own labels, restocked the boxes with its products,
and made them available to customers who requested them.

### Disparaging Remarks

Republic alleges that North Atlantic engaged in an
unlawful "pattern of anticompetitive conduct" by making
disparaging remarks to Republic's customers regarding
Republic's incentive programs and display boxes.
Republic claims that North Atlantic contacted Republic's
customers, both orally and in writing, and falsely told
these customers that Republic's incentive programs
violated federal and state antitrust and unfair
competition laws. Republic alleges that "North
Atlantic's statements were designed to interfere with
Republic's customer relationships by causing customers to
be concerned about the legality of the programs and to
believe that Republic would be unable to honor its
obligations under the programs."

Republic claims that North Atlantic made unlawful
disparaging remarks on several occasions. It is
undisputed that John Czerewko, North Atlantic's director
of sales for the Midwest, sent a letter in late January
1998 (the "Czerewko Letter") to Clark Refining and
Marketing Company ("Clark"), which sells Republic's

products to customers of its gas station/convenience stores. The letter discussed the modifications to the display boxes and asserted that North Atlantic's patent and trademark had been violated, prompting its attorneys to "initiate[ ] legal action." Republic contends that these statements were false because North Atlantic held no patent or trademark rights in the boxes and had not initiated litigation against anyone in connection with the display boxes. Republic also asserts that the Czerewko Letter falsely hinted that Republic's incentive programs are illegal by referring to them as "[s]moke & [m]irrors" and warning Clark to "[b]e aware of the Robinson-Patman Act."

Republic alleges that Clark forwarded the Czerewko Letter to Clark's supplier, Eby-Brown, which buys products directly from Republic, and that Eby-Brown discontinued its participation in Republic's incentive programs after receiving the letter. Republic also claims that Clark subsequently discontinued its participation in Republic's incentive programs as well.

It is undisputed that on August 13, 1998, North Atlantic sent a letter (the "August 13 Letter") to its customers, many of whom are also Republic's customers. The August 13 Letter stated that North Atlantic filed a lawsuit against Republic in Kentucky, and described North Atlantic's allegations in that suit. The allegations addressed, among other things, Republic's incentive programs and modification of the display boxes. The August 13 Letter did not mention the instant action, which was filed in late June 1998.

Republic contends that North Atlantic's alleged misstatements have caused Republic to lose sales and have discouraged Republic's customers from participating in its incentive programs.

Republic Tobacco, L.P. v. North Atl. Trading Co., 254 F. Supp. 2d

985, 989-90 (N.D. Ill. 2002) (footnotes and citations omitted).

The August 13 letter recited in part:

The complaint alleges that Republic Tobacco's exclusivity agreements, rebates, incentive programs, buybacks and other activities violate federal and state antitrust and unfair competition laws. The complaint charges that Republic Tobacco entered into contracts, combinations and conspiracies in illegal restraint of trade and has attempted to illegally monopolize, and has illegally

monopolized, the roll-your-own ("RYO") cigarette paper market in the southeast United States.

The complaint also alleges that Republic Tobacco has defaced and directed others to deface North Atlantic's and National Tobacco's vendor displays for ZIG-ZAG® RYO cigarette papers. On many of these vendors, the ZIG-ZAG® brand name has been covered up with an advertisement for JOB®, TOP® and other Republic Tobacco RYO cigarette brands. The lawsuit alleges that these activities violate North Atlantic's and National Tobacco's rights and constitute unfair competition under federal and state law.

(Id. at 1001.)

We held that the statements in the Czerewko Letter that North Atlantic owned the "patent-trademark which has been violated" and that its attorneys had "initiated legal action" regarding this "violation" constituted defamation per se.[1]   (Id. at 1000-01.) Likewise, we held that the statements in the August 13 Letter constituted defamation per se, rejecting North Atlantic's assertion that the letter was accurate, or alternatively, a privileged communication. (See id. at 1002.) Although we found that Republic had not shown that it suffered specific damages (loss of business) resulting from the Czerewko Letter or the August 13 Letter, statements that are defamatory per se are considered so obviously and materially harmful that injury may be presumed.  See, e.g., Kolegas v. Heftel Broad. Corp., 607 N.E.2d 201, 206 (Ill. 1992).

---

[1] On the other hand, we found that the statements "there may be some Smoke & Mirrors" and "[b]e aware of the Robinson-Patman Act" were not actionable, as they represented Czerewko's subjective views of Republic's programs and were not statements that could be objectively verified.

In July 2003, the damages issue was tried to a jury. The trial resulted in awards to Republic of $8.4 million in compensatory damages and $10.2 million in punitive damages. North Atlantic has filed a post-trial motion seeking a remittitur of damages or a new trial.

## DISCUSSION

### A. Compensatory Damages

In Brown & Williamson Tobacco Corp. v. Jacobson, 827 F.2d 1119 (7th Cir. 1987), the Seventh Circuit described damage remedies in defamation cases and, in particular, the doctrine of presumed damages under Illinois law:

> In general, damage remedies in defamation cases can include: (1) compensatory damages which may be either general or special; (2) punitive or exemplary damages; and (3) nominal damages. Illinois adheres to the general rule. In seeking compensatory damages, a plaintiff may attempt to prove "special damage, that is, of directly linking specific [economic] loss to the [defamatory material] by competent evidence." In certain actions in which the defamatory material is characterized as defamatory per se, the plaintiff may recover general compensatory damages without proving special damages. This is called the doctrine of presumed damages and it allows the assessment of damages "without proof by the plaintiff that there [has] been any impairment of reputation." Under that doctrine, presumed damages is "an estimate, however rough, of the probable extent of actual loss a person had suffered and would suffer in the future, even though the loss could not be identified in terms of advantageous relationships lost, either from a monetary or enjoyment-of-life standpoint."

Id. at 1138 (citations omitted). In Brown & Williamson, the defendants reported in a television news broadcast that the

plaintiff, a cigarette manufacturer, had adopted a "pot, wine, beer, and sex" advertising strategy to attract children to smoking. Defendants delivered the news report in spite of their knowledge that the plaintiff never actually adopted the advertising strategy. See id. at 1123-27. At trial, the plaintiff relied on the doctrine of presumed damages. See id. at 1138. The jury returned a verdict for the plaintiff and awarded $3 million in compensatory damages and $2.05 million in punitive damages. Following post-trial motions, the district court reduced the compensatory damages award to $1.00 but upheld the punitive damages award. The Seventh Circuit affirmed the district court's decision on liability and punitive damages, but reversed its compensatory damages ruling and reinstated $1 million of the $3 million originally awarded by the jury. See id. at 1121-22.

During the damages portion of the trial in that case, Brown & Williamson "introduced a variety of evidence intended to show that its reputation had been harmed by [defendants'] statement." Id. at 1138. In the instant case, Republic took the same tack as Brown & Williamson. Three of its witnesses (Republic's President, Donald Levin; its Executive Vice President and in-house counsel, Seth Gold; and its National Sales Manager, Warren Schoening) testified that after the August 13 Letter was sent, Republic received phone calls from its salesmen and from dozens of customers indicating that customers thought less of Republic, were worried that Republic

had "dragged them into illegal conduct," and were wary of further participation in Republic's incentive programs. (Trial Tr. at 128, 316, 487.) Mr. Levin testified that reputation is important in the small, closely-regulated tobacco industry and that Republic had built strong business relationships and a good reputation over the years. According to Mr. Levin, Republic's reputation in the industry was significantly damaged. (Tr. at 103-04, 139-40.) Mr. Levin also testified that Republic received a "chilly" reception at trade shows that occurred shortly after the August 13 Letter was sent. (Tr. at 130.) Mr. Schoening testified that in 30 years in the industry, he had never seen anything like the statements in the August 13 Letter being communicated to customers. (Tr. at 318, 353.)

In closing argument, counsel for Republic argued that the jury could determine the damage to Republic's reputation by taking a percentage of "the value of a good name" in the business. (Tr. at 727.) North Atlantic itself had determined the value of a good name, asserted Republic, when it publicly reported the value of its goodwill subsequent to National Tobacco Company's acquisition of North Atlantic Trading Company as $140 million. Republic argued that Republic and North Atlantic were similarly-sized companies and therefore that North Atlantic's valuation of its own goodwill was relevant to the value of Republic's goodwill. Republic's counsel acknowledged that Republic did not lose all of its goodwill as a

result of North Atlantic's conduct, but argued that there was "material" damage to Republic's reputation that could be valued as a percentage of the $140 million figure--5, 10, 20 percent or more. (Tr. at 727-31.)[2]

North Atlantic first contends that the compensatory damage award is excessive because it is "substantial," and that "Illinois law is clear that substantial damages are not presumed." (Defendant's Memorandum in Support of Motion at 3-4.)  North Atlantic cites <u>Bloomfield v. Retail Credit Co.</u>, 302 N.E.2d 88, 99 (Ill. App. Ct. 1973) as support for its argument.  <u>Bloomfield</u>, however, is of little help to us, for the reasons expressed by the Seventh Circuit in <u>Brown & Williamson</u>:

> In <u>Bloomfield</u>, the Puritan Life Insurance Company had requested a background report on Harold Bloomfield whom it was considering for a position as an insurance agent. The defendant in <u>Bloomfield</u>, the Retail Credit Company, supplied a background report to Puritan that contained defamatory material about Bloomfield.
> . . .
> The jury in <u>Bloomfield</u> awarded $50,000 in compensatory damages and $100,000 in punitive damages.  The appellate court ordered a new trial on damages because there was a great deal of improperly admitted evidence that probably prejudiced the jury. . . . [T]he evidence showed that there had been only one publication of the defamatory material, that it had been corrected only one month after it was issued, and that it may not have had any effect at all on Bloomfield's employability with Puritan.  It was in this context that the appellate court made the statement that "<u>substantial</u> damages are not presumed."

---

[2] "[Y]ou . . . have to decide how much of that hundred 40 million dollars of goodwill was impaired.  Was it material?  I think the evidence shows that it was.  What does material mean?  It could mean 5 percent, could mean 10 percent. In this case it could mean 20 or more."  (Tr. at 731.)

In <u>Bloomfield</u>, it was clear to the appellate court that $50,000 in compensatory damages was excessive. The defamatory material was published to only one potential employer and because it was corrected promptly, it had very little effect on Bloomfield's reputation in the community. There was also a serious question whether the report had any significant impact on Bloomfield's relationship with Puritan. We conclude that <u>Bloomfield</u> provides us with very little assistance in deciding this case. It simply gives a broad guideline that substantial damages, a term whose meaning is not clear, will not be presumed.

<u>Brown & Williamson</u>, 827 F.2d at 1140-41. A prohibition on "substantial" presumed damages seems to be merely another way of saying that the damages cannot be excessive in light of the circumstances, which of course must be evaluated on the specific facts of a particular case.

North Atlantic also asserts that any compensatory damages award of greater than $1 million is excessive because the Seventh Circuit found that $1 million was an appropriate compensatory damages award in <u>Brown & Williamson</u>. Actually, both parties devote considerable attention in their briefs to comparing <u>Brown & Williamson</u> with the instant case. A point-by-point comparison of the two cases, however, will not assist us in analyzing the damages award here; the involvement of defamatory conduct is just about the only factual similarity between this case and <u>Brown & Williamson</u>.[3]

---

[3] It is unnecessary to address the parties' disagreement over whether Illinois law permits a comparability analysis. There is no case comparable to this one in the defamation arena; each appears to us to be <u>sui generis</u>.

Nor are we impressed by the argument of either party regarding whether Republic showed an actual loss of business as a result of the defamatory statements. We had already ruled that Republic failed to show specific loss, but under the doctrine of presumed damages, it was not necessary for Republic to do so. See Brown & Williamson, 827 F.2d at 1140 ("The failure to prove specific pecuniary damages does not in any way impair the right of Brown & Williamson to recover for the libelous broadcast.") North Atlantic argues that the jury must have been "influenced by passion and prejudice" because of the unprecedented size of the damages awards. (Defendant's Memorandum in Support of Motion at 17.) We disagree. It does not follow from the mere size of the award that "passion and prejudice" was involved. The factual circumstances of the case were not inflammatory in the sense that a juror would be extremely shocked or outraged by North Atlantic's conduct, and there is no evidence that the jury acted out of passion or prejudice. Moreover, the jury was attentive and was not exposed to improper evidence. The jury was also accurately instructed on general damages as follows:

> [Y]ou must not consider the question of whether these statements are false and defamatory. I have already made that decision. The issue you will need to decide is the amount of damages that should be awarded to Republic for these false and defamatory statements.
> There are two kinds of damages you may award Republic as a consequence of North Atlantic' defamation: general damages and punitive damages. I will discuss them separately.

        I found that Republic has not shown that it suffered
lost sales to customers as a result of the Czerewko memo
and the August 13 Letter.  However, because of their
defamatory nature, the law presumes that North Atlantic's
statements about Republic caused injury to Republic's
reputation and allows Republic to recover general damages
for these statements without showing any particular
evidence of harm to its reputation or any specific
economic injury.
        In essence, these general damages should be a
reasonable estimate, however rough, of the probable
extent of actual damage Republic's reputation has
suffered and may suffer in the future as a proximate
result of the defamatory statements, even though this
damage may not be quantifiable from a monetary standpoint
in terms of any sales or advantageous relationships lost.
        In determining the amount of general damages, you
should consider the nature of North Atlantic's
statements, the number of people who heard these
statements or read them, the effect of these statements
on Republic's reputation, its business dealings with
others and all facts and circumstances of this case.

(Tr. 773-74.)

        The jury awarded Republic $8.4 million in compensatory

damages.  We are unsure of the arithmetic rationale for this

verdict.  Republic points out that $8.4 million is 6 percent of the

$140 million "goodwill" figure it suggested to the jury; perhaps

this was the jury's method, but we would be more convinced of such

a conclusion if the percentage were 5 or 10.  Our uncertainty as to

the jury's arithmetic reasoning does not mean that the verdict

lacked a rational basis, but merely that the jury arrived at its

verdict using a rationale that we cannot discern from the result.

        We note that in final argument North Atlantic elected not to

suggest an alternative method of valuing the damage to Republic's

reputation, nor any figure that would be an appropriate maximum

verdict. Counsel for North Atlantic did toss out the idea of "nominal damages" and hinted that the jury could possibly award Republic $1, or maybe $10,000. (Tr. at 747.) However, this suggestion was coupled with the argument that there was no evidence of lost sales and therefore no real harm--which, of course, flies in the face of the doctrine of presumed damages. North Atlantic failed to acknowledge that there was <u>any</u> harm to Republic and chose not to offer the jury any guidance whatever in estimating damages. Only now does North Atlantic assert that $1 million is the maximum possible amount of general damages (and, <u>see</u> <u>infra</u>, that it has a negative net worth). Had North Atlantic made an argument to the jury as to why damages could not exceed $1 million, conceivably the jury would have agreed and returned a verdict not exceeding that amount. We have no way of knowing. Instead, North Atlantic took its chances by offering the jury no help at all and now seeks a determination by this court that damages cannot exceed a particular amount. There is no basis on the trial record, though, for fixing any particular <u>limit</u> on damages, whether compensatory or punitive.[4]

The issue here is simply whether the jury's compensatory damages award is excessive, or whether it is within an acceptable range. <u>See</u> <u>Brown & Williamson</u>, 827 F.2d at 1141-42 (stating that under Illinois law, an appellate court must give "some deference"

---

[4] <u>See</u> <u>infra</u> section B for our discussion of North Atlantic's post-trial submissions regarding its net worth.

to the jury's determination of presumed damages "while also considering whether it considers the jury award . . . excessive").

Although we have rejected all of North Atlantic's arguments thus far, we agree with its most basic argument: $8.4 million is simply excessive given the evidence of harm in this case. Republic did not prove that its reputation had been injured to the extent that $8.4 million would be a reasonable estimate of the damage. Although the defamatory statements were published to many of Republic's important customers, the publication was not wideranging. The statements were delivered by Republic's staunch competitor, not by an individual or organization whom Republic's customers would view as unbiased. Furthermore, the defamatory statements were isolated occurrences; North Atlantic did not repeat them over and over.

For these reasons, in this court's judgment, an award of $3.36 million in compensatory damages is appropriate in this case. That figure represents 40% of the jury award. We do not pretend that there is a great deal of precision in arriving at this figure, nor did the Seventh Circuit in Brown & Williamson, 827 F.2d at 1142 ("We recognize that this is a very inexact and somewhat arbitrary process. Nonetheless, the process is inherent in the doctrine of presumed damages. An appellate court must, under Illinois law, use its judgment in determining the extent to which a jury award of presumed damages will be upheld.").

**B.   Punitive Damages**

The jury was instructed that under Illinois law, "[t]o recover punitive damages, plaintiff must prove that the defendant knew the statements were untrue, or made the statements with conscious disregard as to whether they were true or not."   (Tr. at 774-75.) The purpose of punitive damages is deterrence.   See Brown & Williamson, 827 F.2d at 1143.    Punitive damages "should be proportional to the wrongfulness of the defendant's actions." Mathias v. Accor Econ. Lodging, Inc., 347 F.3d 672, 676 (7th Cir. 2003).

North Atlantic contends that the jury's punitive damages award of $10.2 million is excessive under both federal law and Illinois law.   "Illinois courts look to three factors in analyzing this issue: (1) the nature and enormity of the wrong, (2) the financial status of the defendant, and (3) the potential liability of the defendant resulting from multiple claims."   Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co., 962 F.2d 628, 640 (7th Cir. 1992) (citing Hazelwood v. Illinois Cent. Gulf R.R., 450 N.E.2d 1199, 1207 (Ill. App. Ct. 1983)).[5]   The analysis is similar under federal law.   We consider (1) the degree of reprehensibility of defendant's conduct; (2) the relationship between the amount of the punitive damages award and the harm or

---

[5] The third factor in this analysis--potential liability from multiple claims--is not relevant here, as Republic was the sole target of North Atlantic's conduct.

potential harm suffered by the plaintiff; and (3) the sanctions imposed in other cases for comparable misconduct. <u>See</u> <u>Ibanez v. Velasco</u>, No. 96 C 5990, 2002 WL 731778, at *12 (N.D. Ill. Apr. 25, 2002) (citing <u>BMW of North Am., Inc. v. Gore</u>, 517 U.S. 559, 574-75 (1996)).

The "nature and enormity of the wrong" factor under Illinois law and the "reprehensibility" factor under federal law seem to be identical, and controlling here. "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." <u>BMW</u>, 517 U.S. at 575. This factor cuts in North Atlantic's favor because North Atlantic's conduct simply was not exceedingly reprehensible. There was ample evidence from which to conclude that North Atlantic's statements were made without regard for their truth, but the harm was strictly economic. No one's health or safety was jeopardized; Republic was not a vulnerable target; and the statements were not repeated over and over. Moreover, the August 13 Letter (which included statements that Republic was violating antitrust laws) was defamatory, but it was an almost "technical" rather than a blatantly abusive type of defamation.[6]

_____

[6] In this respect, the August 13 Letter is somewhat different from the Czerewko Letter. North Atlantic argues that the Mr. Czerewko "honestly believed that Republic's use of North Atlantic's vendor displays infringed North Atlantic's intellectual property rights." (Reply at 17.) It is difficult to understand how a layperson could even form such an "honest belief," given the complicated nuances of intellectual property law. It is not akin, for instance, to a belief that one's tangible property has been stolen.
    In contrast are the statements in the August 13 Letter, which were defamatory because, as this court held, Republic had not violated antitrust laws.

The relationship between the amount of the punitive damages award and the harm or potential harm suffered by the plaintiff weighs in favor of a remittitur of punitive damages as well, but is only somewhat helpful. Sometimes this inquiry is expressed by examining the ratio of punitive damages to compensatory damages, which here is approximately 1.2 to 1. This ratio, of course, is much lower than other ratios that have passed muster, but it is probably not a strong indicator of reasonableness. When compensatory damages are very high, a low ratio does not necessarily indicate that the punitive damages award is reasonable. See Ibanez, 2002 WL 731778, at *13. The overall concern is reasonableness in the context of actual harm suffered and the potential harm that the defendant's conduct could have caused. See id. at *14. As discussed supra, the harm was not greatly extensive, and the proof does not show that the potential harm was much worse than what actually occurred. Thus, what we will call the harm factor (for lack of a better term) weighs in favor of a reduction of the punitive damages award, but not as strongly as the reprehensibility factor.

North Atlantic points to its financial condition as another reason to remit the punitive damages award, but we do not give this factor much, if any, weight. At trial, there was not a great deal of evidence about North Atlantic's finances, and very little evidence introduced by North Atlantic itself. There was evidence

regarding North Atlantic's annual net profits ($5.5 million), and of its debt load and its EBITDA (earnings before interest, taxes, depreciation, and amortization). The parties wrangle at length over how to determine North Atlantic's "net worth," but the bottom line is that none of the evidence of North Atlantic's financial condition <u>that was before the jury</u> indicates that North Atlantic cannot bear or should not have to bear the jury's punitive damages award. It is only now, <u>after</u> trial, that North Atlantic submits evidence (via the Reply Declaration of its president and CFO, David Brunson) of its net worth, which it now claims is "negative $41.5 million." (Defendant's Memorandum in Support of Motion, Ex. 10, at 2.) We will not consider this evidence because it was not submitted during trial. See <u>Williams v. Patel</u>, 104 F. Supp. 2d 984, 997-98 (C.D. Ill. 2000) ("[Defendant] failed to introduce any evidence concerning his wealth despite having the opportunity to do so during the course of the trial. This tactical decision on the part of his attorneys will not now serve as a basis for either negating or reducing the award of punitive damages."). North Atlantic contends that "it goes without saying that until North Atlantic knew the amount of the verdict, [it] was in no position to assess its impact." (Reply at 20.) It also goes without saying that because North Atlantic made the tactical decision not to present the evidence to the jury that it now wants us to consider, it now must accept the outcome of that decision.

The third BMW factor calls for a comparison of the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct. As mentioned supra note 4, there appear to be no comparable civil cases, and, as North Atlantic notes, there are no possible criminal penalties for North Atlantic's conduct. Therefore, this factor is of no assistance here. The underlying issue is "fair notice," see Ibanez, 2002 WL 731778 at *14, and because there are no "comparables," North Atlantic cannot show that it was misled in any way as to the potential liability for its misconduct.

North Atlantic also contends that the punitive damages award was influenced by passion and prejudice, the prejudice stemming "significantly from . . . the evidence that North Atlantic's prior counsel served subpoenas on several of Republic's customers for, among other things, tax records." (Defendant's Memorandum in Support of Motion at 17.) According to North Atlantic, the trial became one about the subpoenas rather than about the defamatory statements. We disagree. The evidence regarding the subpoenas was not a permissible basis for punitive damages, but it was highly relevant to North Atlantic's motive and intent in sending the letters. North Atlantic complains that "[e]very Republic witness was questioned about the harm brought on by the subpoenas." (Reply at 18.) This bore on the intent of the defendant in issuing the subpoenas. Of course the subpoenas were intimidating and caused

the customers distress--that is exactly what North Atlantic intended. (People are presumed to intend the natural consequences of their actions.) If the subpoenas had been harmless, the fact that they were issued would not have been relevant. Moreover, immediately before the subpoena evidence was received, the jury was accurately instructed as to the purpose of that evidence as follows:

> Let me explain to the jury the limited purpose for which I am permitting evidence about these subpoenas to be received and considered by you.
> These subpoenas are not something for which Republic can recover damages in this lawsuit. They are not part of the defamation claim, but they do have possible relevance to the defamation claim in the following way.
> You may find and you may not find, it's entirely up to you, let's just say that you could find that these subpoenas and the materials they call for to be produced by these customers may throw light on North Atlantic's particular intent and motive in making the defamatory statements. It was at a different time, somewhat later than the defamatory statements. But you should know that . . . Republic came into court and moved to quash these subpoenas, and I granted that motion. I quashed all 33 of these subpoenas on the basis that in my view they were irrelevant to the lawsuit. The materials they called for were not relevant to the lawsuit that was pending before me and pursuant to which the subpoenas were issued.
> Now, I express no opinion whatsoever on the question of whether you will find these subpoenas helpful in your analysis of the case. But I'm allowing you to consider them and I'm allowing the parties to argue one way or the other as to whether they do shed light on the state of mind of North Atlantic and the intent and motive of North Atlantic at the time these defamatory statements were made.

(Tr. at 134-35.) Thus, the jury was clearly instructed that the subpoenas were only relevant to the defamation claim to the extent

that they bore on North Atlantic's intent in making the defamatory statements.

North Atlantic makes several other arguments that we need not consider because they were not raised at any time prior to the instant motions and are therefore waived.[7]

In summary, the "reprehensibility" factor and, to a lesser extent, the "harm" factor indicate that the punitive damages award was excessive under both Illinois and federal law. Considering all of the circumstances, we believe that an appropriate punitive damages award against North Atlantic is $4.08 million. Like our remittitur of the compensatory damages award, this figure represents 40% of the original punitive damages award (of $10.2 million). Again, we acknowledge that the process by which we arrived at this figure is largely subjective, but, in the nature of things, it cannot be otherwise. We believe that this reduced figure appropriately reflects the nature of North Atlantic's misconduct. Moreover, it will achieve the deterrent purpose of punitive damages without being an unjustified burden on North Atlantic.

---

[7] These include North Atlantic's First Amendment/Noerr-Pennington argument and arguments concerning Republic's statements in closing argument to which no objections were made. In addition, North Atlantic rehashes its contention that it had a "qualified privilege" regarding the August 13 Letter. We rejected this argument at the summary judgment stage of the case, and for the same reasons, we reject it now.

## CONCLUSION

North Atlantic's motion for remittitur or a new trial is granted. The compensatory damages award is remitted to $3.36 million, and the punitive damages award is remitted to $4.08 million. If Republic refuses to accept either or both of the remittiturs, a new trial will be granted on the award or awards for which remittitur is refused. Republic should file a statement by December 10, 2003, indicating whether it accepts the remittiturs.

DATE:          November 20, 2003

ENTER:

John F. Grady, United States District Judge